The PEOPLE of the State of Colorado,
Plaintiff-Appellee,

v.

Ronald NOBLE, Defendant-Appellant.

No. 80SA511.

Supreme Court of Colorado,
En Banc.

Oct. 13, 1981.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Morgan Rumler, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Treece, Zbar, Webb, Corporon & Keene, P.C., John F. Webb, Jr., Littleton, for defendant-appellant.

QUINN, Justice.

Ronald Noble (defendant) was convicted of the crimes of felony child abuse[1] and reckless manslaughter,[2] as well as misdemeanor child abuse[3] and third degree assault.[4] He asserts several grounds for reversal, namely: a violation of equal protection of the laws due to the disparate penalty scheme for felony child abuse and reckless manslaughter; the denial of his pretrial motion to suppress evidence obtained from a search of his home pursuant to warrant; the court's instruction on the definition of "knowingly" as related to the crime of child abuse; the deprivation of his right to a unanimous jury verdict by reason of gener-

al verdict forms of guilty and not guilty to the crime of felony child abuse; and the alleged inconsistency of the verdicts actually returned, especially the guilty verdicts for felony child abuse and manslaughter and those for misdemeanor child abuse and third degree assault. Finding no reversible error, we affirm.[5]

## I. The District Court Proceedings

The defendant was charged in a six count information with extreme indifference murder in the first degree,[6] murder in the second degree,[7] and felony child abuse,[8] allegedly committed on April 12, 1978, as well as misdemeanor child abuse[9] and assault in the third degree[10] on January 30, 1978. The charges arose out of two separate incidents while the defendant was babysitting for the victim, Stephanie Pacheco (Stephanie), a four year old girl.

The defendant and Stephanie's mother, Maleah Fouslee (Maleah), planned to marry early in 1978 and the defendant began babysitting for Stephanie in January of that year. On the afternoon of January 30 the defendant babysat for Stephanie for approximately five hours while Maleah was working. After picking up her daughter, Maleah returned to the residence of her sister and brother-in-law, where she and Stephanie were living at the time. After noticing a hand print on Stephanie's left cheek and other bruises on her hip and

1. Section 18–6–401(1), C.R.S.1973 (1978 Repl. Vol. 8).

2. Section 18–3–104(1)(a), C.R.S.1973 (1978 Repl.Vol. 8).

3. Section 18–6–401(1), C.R.S.1973 (1978 Repl. Vol. 8).

4. Section 18–3–204, C.R.S.1973 (1978 Repl.Vol. 8).

5. This appeal was originally filed in the Court of Appeals, but was transferred to this court pursuant to sections 13–4–102(1)(b) and 13–4–110, C.R.S.1973, because of the defendant's challenge to the constitutionality of section 18–6–401.

6. Section 18–3–102(1)(d), C.R.S.1973 (1978 Repl.Vol. 8).

7. Section 18–3–103(1)(a), C.R.S.1973 (1978 Repl.Vol. 8).

8. Section 18–6–401(1), C.R.S.1973 (1978 Repl. Vol. 8). The felony child abuse count alleged that on April 12, 1978, the defendant knowingly and without justifiable excuse caused or permitted Stephanie Pacheco to be placed in a situation that endangered her life or health or cruelly punished the child, thereby causing serious bodily injury to the child.

9. Section 18–6–401(1), C.R.S.1973 (1978 Repl. Vol. 8). The misdemeanor child abuse count alleged that on January 30, 1978, the defendant knowingly and without justifiable excuse caused or permitted Stephanie Pacheco to be placed in a situation that endangered her life or health.

10. Section 18–3–204, C.R.S.1973 (1978 Repl. Vol. 8).

shoulders, Maleah telephoned the defendant and asked him about the injuries. The defendant stated that he had played with Stephanie by straddling her and gently slapping her head back and forth, but he did not believe that he had struck her hard enough to cause the imprint on her face. He also stated that while he and Stephanie were wrestling, Stephanie fell off the bed. Concerned about her daughter's health, Maleah took Stephanie to Aurora Presbyterian Hospital for examination. Child abuse was suspected and on the following day Maleah took the child to the Aurora Police Department so that photographs could be taken of her injuries.

The second incident occurred on April 12, 1978, when the defendant was again babysitting Stephanie in his home.[11] According to his statement to the emergency room physician at the hospital, the child fell down a set of carpeted stairs and the defendant tried unsuccessfully to revive her with cold water. Shortly thereafter he requested assistance from his parents who lived nearby. While awaiting the arrival of the Aurora Rescue Squad, Stephanie was carried to the parents' home where the defendant's mother, Mrs. Noble, administered mouth-to-mouth resuscitation to the child. Stephanie was taken to Aurora Community Hospital. She had multiple bruises about her neck, face and head.

Officers Egan and Brungardt of the Aurora Police Department arrived shortly after the rescue squad had departed and they questioned Mrs. Noble about the incident. Initially she told the officers that she was at the defendant's home immediately after the child had fallen and observed her on the carpet at the bottom of the stairs. When the officers asked her if it would be possible to see where the incident occurred, Mrs. Noble produced a key given to her by the defendant and let the officers into the defendant's home. Several hours later Mrs. Noble admitted to the officers that her original statement was not true. After inspecting the area, the officers proceeded to Aurora Community Hospital where they questioned the defendant generally about what happened and he described the events surrounding the alleged fall.[12] He told the officers that he was studying in his home for a postal exam and heard someone at the door and that Stephanie at this time was running towards the stairway and she fell down the stairs.

Stephanie was transferred from Aurora Community Hospital to Porter Memorial Hospital because of her need for specialized neurological facilities. She died on April 16, 1978, from cardiac and respiratory failure due to brain swelling and abnormal pressure on the brain stem which, in turn, were caused by intra-cranial hemorrhaging. On the day following the child's death, Detective Herman of the Aurora Police Department filed an affidavit in support of an application for a search warrant for the defendant's home. The affidavit recited the following details of the police investigation to date: the defendant's statement to the officers at the hospital that "he heard someone at the door and the child was running down the hall and fell down the stairs"; the opinion of Dr. Loren Greenspan, emergency room physician at Aurora Community Hospital, that the child sustained severe swelling of the brain and the severity of her injuries was inconsistent with the defendant's explanation of the incident; the statement of another doctor, Dr. Lindsley, describing the child's injuries and indicating that "the case was suspicious because, in his opinion, there was more se-

---

11. After the first incident, a social worker advised that the defendant should not babysit for Stephanie. A few weeks had passed with no further communication from either the social worker or the police and Maleah decided to again permit the defendant to babysit the child. Several times bruises were noticed on Stephanie after the defendant had exclusive custody of her. None of these injuries were brought to the attention of either the police or medical authorities on these occasions. The defendant and Maleah were married on March 25, 1978.

12. At the time of questioning the defendant was not in custody. The trial court found that the statement made by the defendant was voluntarily given and that ruling is not challenged on this appeal.

vere injury to the child than the [defendant's] explanation allows"; the admission by Mrs. Noble that her initial statement to the police was false; a reference to the prior report of child abuse in January 1978; and a statement that the affiant was advised of Stephanie's death on April 17, 1978. The court issued a search warrant for an inspection of the interior of the home including "measurements and photographs . . . and observations by an expert medical doctor in the child abuse field." On April 19, 1978, Detective Herman took photographs and measurements of the rooms and a medical expert examined the interior of the home. The stairway down which Stephanie allegedly fell consisted of seven fully carpeted steps.

Prior to trial the defendant filed a motion to suppress the results of the search. He argued that the original entry on April 12 by Officers Egan and Brungardt was illegal and invalidated the subsequent search on April 19, that the affidavit contained untrue statements and did not establish probable cause, and that the warrant was defective due to an overbroad description of the items to be seized. The court denied the motion to suppress. It ruled that even if the initial entry into the home on April 12 and other challenged portions of the affidavit were disregarded, the remaining parts constituted independent probable cause for the warrant. Also, the court determined that the warrant contained a sufficiently particular description of the objects to be seized in the search.

At trial, diagrams and other evidence descriptive of the house and stairway were presented and admitted as part of the prosecution's case. The prosecution's medical experts testified that in their opinion Stephanie's injuries, which included as many as ten bruises to her skull, were inconsistent with a fall down the carpeted stairway.

With respect to the crime of felony child abuse, the court instructed the jury as follows:

"A person commits the crime of Child Abuse as charged in Count Two (April 12, 1978) if:

"He, without justifiable excuse, knowingly causes or permits a child to be placed in a situation that endangers said child's life or health, or cruelly punishes said child, and the result is serious bodily injury to the child.

"The elements of Child Abuse, are therefore:

1. Without justifiable excuse,

2. Knowingly causing or permitting a child,

3. (a) To be placed in a situation that endangers said child's life or health, or,

(b) Cruelly punishes said child, and

4. The result is serious bodily injury to the child."

The court also gave the following definition of "knowingly" as applicable to the crime of child abuse: "A person acts 'knowingly' with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists."

The trial court submitted to the jury general verdicts for the crime of first degree murder by extreme indifference, second degree murder,[13] reckless manslaughter, felony child abuse, misdemeanor child abuse and third degree assault. The jury returned guilty verdicts to felony child abuse and reckless manslaughter for the April 12 transaction resulting in Stephanie's death, and guilty verdicts to misdemeanor child abuse and third degree assault for the defendant's conduct on January 30. The court imposed concurrent sentences of five to six years for felony child abuse, an indeterminate term not to exceed three years

---

**13.** The court submitted a separate instruction on the definition of "knowingly" as applicable to second degree murder:

"Knowingly: (With respect to conduct and its result) A person acts 'knowingly' with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists. A person acts 'knowingly' with respect to a result of his conduct, when he is aware that his conduct is practically certain to cause the result. This definition applies to the crime of Murder in the Second Degree."

for manslaughter, three months for misdemeanor child abuse and six months for third degree assault. This appeal followed.

## II. *The Constitutionality of Section 18–6–401*

▮ We first address the defendant's contention that the child abuse statute, section 18–6–401, is unconstitutional. At the time the offenses were committed, felony child abuse was a class 3 felony [14] punishable by a term of five to forty years and reckless manslaughter was a class 4 felony punishable by an indeterminate term not to exceed ten years. Section 18–1–105, C.R.S. 1973 (1978 Repl.Vol. 8). The defendant argues that section 18–6–401 violates his right to equal protection of the law, *U.S.Const.* Amend. XIV; *Colo.Const.* Art. II, Sec. 25, by proscribing conduct identical to that proscribed by the reckless manslaughter statute, section 18–3–104(1)(a), C.R.S.1973 (1978 Repl.Vol. 8), yet authorizing the imposition of a greater penalty.

We considered this identical argument in *People v. Christian*, Colo., 632 P.2d 1031 (1981), and resolved it as follows:

"For purposes of equal protection, there are significant differences between the legislative proscription of specifically defined acts of child abuse resulting in serious bodily injury, as outlined in section 18–6–401, and the general proscription of reckless conduct resulting in death to any person, adult or child, as proscribed in section 18–3–104. We conclude that the legislative classification of child abuse as a crime warranting a more serious penalty than reckless manslaughter does not violate equal protection of the laws." *People v. Christian, supra,* Colo., 632 P.2d at 1036.

We adhere to our decision in *Christian* and reject the defendant's equal protection argument.

## III. *The Search of the Defendant's Home*

▮ The defendant claims as error the admission of the evidence seized inside his home during the search pursuant to warrant on April 19, 1978. He contends, first, the affidavit supporting the search warrant does not allege probable cause; second, the search warrant is overbroad in its description of the items to be seized; and, third, the warrant fails to particularize the issuing judge's determination of probable cause. We find no merit in these arguments.

In denying the defendant's motion to suppress the trial court accorded the defendant the benefit of all doubt on the issue of probable cause. It disregarded those portions of the affidavit reciting the officers' observations upon their entry into the home on April 12, the statement of Dr. Lindsley that "the case was suspicious," the reference to a prior act of child abuse, and the statement concerning the death of the child. Although it is questionable indeed whether the court was required to ignore these parts of the affidavit,[15] we are satisfied that the affidavit, exclusive of the challenged portions, does establish probable cause. It recites a serious brain injury to a four year old child occurring inside the defendant's home, the defendant's purported explanation of the injury, the emergency room physician's opinion that the severity of the injury was inconsistent with the defendant's explanation, and Mrs. Noble's admitted effort to falsify the circumstances surrounding the injury. The sources of all this information were police officers or persons

14. Under section 18–6–401(7), C.R.S.1973 (1978 Repl.Vol. 8), child abuse was classified as a class 3 felony if the act resulted in serious bodily injury to the child; otherwise it was a class 2 misdemeanor.

15. In ruling on the defendant's motion to suppress, the court stated that it believed the testimony of Officers Egan and Brungardt about Mrs. Noble's voluntarily admitting them into the defendant's home on April 12 with a key which she had in her possession. However, it chose to disregard any recitals in the affidavit which arguably might be traced to the initial entry into the home, such as the opinion of Dr. Lindsley regarding the suspicious character of the child's injury. It is not apparent why the court chose to disregard the recitals which reported the child's death on April 17, 1978, and the reference to the prior report of child abuse in January 1978.

known to the police, their identities were disclosed in the affidavit, and under the circumstances of this case the reliability of the information may be presumed. *See, e. g., People v. Henry*, Colo., 631 P.2d 1122 (1981); *People v. Glaubman*, 175 Colo. 41, 485 P.2d 711 (1971). On the basis of these recitals alone, it is reasonable to believe that Stephanie's injuries resulted from criminal conduct which occurred inside the defendant's home on April 12, 1978, and an examination of that home was appropriate. *See, e. g., People v. Hampton*, 196 Colo. 466, 587 P.2d 275 (1978); *People v. Woods*, 175 Colo. 34, 485 P.2d 491 (1971); *People v. Malone*, 175 Colo. 31, 485 P.2d 499 (1971).

■ We also are satisfied that the search warrant was not overbroad in its description of the items to be seized. A rigid and unrealistic reading of a search warrant is not mandated. *People v. Lamirato*, 180 Colo. 250, 504 P.2d 661 (1972). Instead, the description of the property to be seized should be such that "the officer charged with the duty of executing the warrant will be advised with a reasonable degree of certainty of the property to be seized." *People v. Schmidt*, 172 Colo. 285, 290, 473 P.2d 698, 700 (1970); *see also People v. Lindholm*, 197 Colo. 270, 591 P.2d 1032 (1979). The warrant here described the items to be seized with such particularity that there was little likelihood of confusion or uncertainty by the executing officer as to the scope of the permissible search.

■ Finally, the search warrant was not invalidated by the failure of the issuing judge to particularize the reasons for his determination of probable cause. Crim.P. 41(d)(III) provides that a search warrant shall "[s]tate the grounds or probable cause for its issuance." The provision was not intended to require the issuing judge to describe his mental process for reaching a probable cause determination "but rather to require only that he state that the result

has been reached." *People v. Singleton*, 174 Colo. 138, 141, 482 P.2d 978, 979 (1971). The search warrant expressly recited that the inspection, measurement and photographing of the interior of the home at 1781 South Naples Street in Aurora, Colorado, "would be material evidence in a subsequent criminal prosecution." Such recitation is nothing short of a literal compliance with Crim.P. 41. Thus, the trial court properly denied the defendant's motion to suppress.

### IV. *The Definition of "Knowingly"*

■ The defendant argues that the court's instruction on the definition of "knowingly" for the crime of child abuse was legally insufficient because it defined the mental culpability only in terms of conduct or circumstance rather than result. Specifically, the defendant contends the crime of felony child abuse as charged, *see* note 8, *supra*, requires an awareness by the actor that his conduct is practically certain to cause the proscribed result—*i. e.*, endangerment to the child's life or health, or cruel punishment. Likewise, he contends that the crime of misdemeanor child abuse as charged, *see* note 9, *supra*, requires an awareness that one's conduct is practically certain to endanger the child's life or health. We disagree with his argument.

On the date of the offenses section 18–6–401(1), C.R.S. 1973 (1978 Repl. Vol. 8), defined the crime of child abuse as follows:

"(1) A person commits child abuse if he knowingly, intentionally, or negligently, and without justifiable excuse, causes or permits a child to be:

(a) Placed in a situation that may endanger the child's life or health; [16] or

(b) Exposed to the inclemency of the weather; or

(c) Abandoned, tortured, cruelly confined, or cruelly punished; or

---

16. In *People v. Hoehl*, 193 Colo. 557, 568 P.2d 484 (1977), the word "may" in subsection 18–6–401(1)(a) was construed to mean a reasona-

ble probability that the child's life or health will be endangered from the situation in which the child is placed.

(d) Deprived of necessary food, clothing, or shelter." [17]

\* \* \* \* \* \*

"(7) Child abuse is a class 2 misdemeanor, but if it results in serious bodily injury to the child, it is a class 3 felony."

The statutory definition of "knowingly" is found at section 18–1–501(6), C.R.S. 1973 (1978 Repl.Vol. 8):

"A person acts 'knowingly' . . . with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists. A person acts 'knowingly' . . . with respect to a result of his conduct, when he is aware that his conduct is practically certain to cause the result."

In *People v. Taggart*, Colo., 621 P.2d 1375 (1981), we noted that the statutory terms "tortured" and "cruelly punished" do not refer to the *mens rea* of child abuse.

"Rather, these words refer to the *actus reus* as measured by the consequences wrought on the child. Thus, a person may negligently cause or permit a child to be placed in a situation so debilitating to the child's physical well-being that a reasonable juror, looking at the effect of the offender's conduct on the child, would consider it torture or cruel punishment." Colo., 621 P.2d at 1383.

Similarly, the requirement of "knowingly" in the statutory definition of child abuse does not refer to the actor's awareness that his conduct is practically certain to cause the proscribed result. Instead, "knowingly"

refers to the actor's general awareness of the abusive nature of his conduct in relation to the child or his awareness of the circumstances in which he commits an act against the well-being of the child. Although this distinction between an awareness of one's conduct or circumstance, on the one hand, and an awareness of the result of one's conduct, on the other, at times may be a subtle one, it is a distinction recognized by the Colorado Criminal Code itself. Sections 18–1–502 and 18–1–503(4), C.R.S. 1973 (1978 Repl.Vol. 8); *see People v. Johnson*, Colo., (1981) (S.Ct. No. 80SA26, announced September 14, 1981); *People v. Andrews*, Colo., 632 P.2d 1012 (1981).

■ If the legislature intended criminal responsibility to hinge on the actor's awareness that his conduct is practically certain to cause the proscribed result, it hardly would have established as an alternative to the element of "knowingly" the culpable mental state of "negligently." A person acts "negligently" when he fails to perceive a substantial and unjustifiable risk that a result will occur or that a circumstance exists. Section 18–1–501(3), C.R.S. 1973 (1978 Repl.Vol. 8). A failure to perceive a risk does not entail an awareness that one's conduct is practically certain to cause the proscribed result. Under section 18–6–401(1), C.R.S. 1973 (1978 Repl.Vol. 8), however, child abuse may be committed by acting "negligently," thus indicating a legislative intent to define the mental culpability for the offense in terms of conduct or circumstance rather than solely in terms of result. [18]

---

17. The child abuse statute was substantially amended in 1980 with respect to the culpable mental states for various forms of child abuse and the respective penalties for acts resulting in death, serious bodily injury, or other injury to the child. Section 18–6–401, C.R.S. 1973 (1980 Supp.).

18. Since its original enactment as part of the Colorado Criminal Code in 1971, the crime of child abuse has required alternative culpability elements of "knowingly," "intentionally" or "negligently." Colo.Sess. Laws 1971, ch. 121, 40–6–401 at 448–49. When the Colorado Criminal Code was adopted in 1971, "intentionally" was defined in terms of a conscious object to

cause a result or to engage in conduct, C.R.S. 1963, 40–1–601(6); "knowingly" was defined only in terms of an awareness of the nature of one's conduct or the existing circumstance, C.R.S. 1963, 40–1–601(7); and "negligently" was defined in terms of failure to perceive a substantial and unjustifiable risk that a result will occur or that a circumstance exists, C.R.S. 1963, 40–1–601(9).

Effective July 1, 1977, the definitions of "intentionally" and "knowingly" were amended. Colo.Sess. Laws 1977, ch. 224, 18–1–501(5) and (6) at 959. "Intentionally" was then defined solely in terms of result, that is, a "conscious objective . . . to cause the specific result proscribed by the statute defining the offense."

■ In this case the plain meaning of the instructions on felony child abuse requires the prosecution to prove beyond a reasonable doubt the defendant's awareness that his physical actions towards the child were such as to endanger the child's life or health or to cruelly punish the child. Since this awareness is consistent with the statutory definition of felony child abuse as charged in this case, *see* note 8, *supra*, we conclude that the jury was adequately instructed on the *mens rea* for that crime. Likewise, the jury was adequately instructed on the requisite culpability for misdemeanor child abuse as charged, *see* note 9, *supra*, namely an awareness by the defendant that his physical actions towards the child were such as to endanger the child's life or health.

### V. *The General Verdict*

■ The defendant challenges his conviction for felony child abuse because the jury instruction outlined two alternative ways the crime could be committed but the verdict forms merely recited a guilty verdict for child abuse without specifying the precise manner in which the crime was committed. Thus, the defendant claims that he was denied his right to a unanimous jury verdict. We conclude otherwise.

The statutory definition of child abuse in section 18–6–401(1), C.R.S. 1973 (1978 Repl. Vol. 8), lists several alternative ways the offense may be committed. The various methods of committing the offense are somewhat similar in character and include the two methods charged in this case, *i. e.*, knowingly causing or permitting the child to be placed in a situation that endangers its life or health, and knowingly causing or permitting the child to be cruelly punished.

As charged, the crime of felony child abuse does not involve alternative forms of culpability or conduct which are so discrete and independent that, as a practical matter, a verdict of guilty to one alternative reasonably could be interpreted as exclusive of the other. A person can be well aware that his conduct is causing or permitting a child to be placed in a situation likely to endanger the child's life or health and concomitantly be aware that this same conduct is cruelly punishing the child.

In *People v. Taggart, supra*, we dealt with the issue of verdict unanimity in a child abuse case and, under circumstances similar to those present here, upheld a general verdict of guilty. *See also, People v. Ledman*, Colo., 622 P.2d 534 (1981); *Claxton v. People*, 164 Colo. 283, 434 P.2d 407 (1967); *Hernandez v. People*, 156 Colo. 23, 396 P.2d 952 (1964). In the instant case, as in *Taggart*, the court instructed the jury on the general requirement of a unanimous verdict and the record discloses ample evidence to support a guilty verdict on either or both methods of committing the offense. Considering the entire record of this case, we cannot say that defendant was deprived of his right to a unanimous verdict.

### VI. *The Claimed Inconsistency of Verdicts*

The defendant's claim of verdict inconsistency centers on the separate transactions of April 12 and January 30, 1978, each of which resulted in guilty verdicts for two offenses based on the same transaction. Upon close scrutiny of the verdicts, we find no merit in his claim.

In connection with the incident of April 12, the defendant initially argues that the guilty verdict for felony child abuse is logi-

Section 18–1–501(5), C.R.S. 1973 (1978 Repl. Vol. 8). "Knowingly," on the other hand, was defined in terms of an awareness of one's conduct or the existing circumstance, or an awareness that one's conduct is practically certain to cause the proscribed result. Section 18–1–501(6), C.R.S. 1973 (1978 Repl.Vol. 8). All offenses requiring the culpable mental state of "knowingly" were "declared to be general intent crimes." Section 18–1–501(6), C.R.S. 1973 (1978 Repl.Vol. 8). There was no change in the definition of "negligently" which, with a minor

amendment not pertinent here, *see* Colo.Sess. Laws 1975, ch. 167, 18–1–501(3) at 616, remained in the form originally enacted in 1971. In spite of the significant changes in the definitions of "intentionally" and "knowingly" enacted in 1977, there was no statutory change at that time in the culpability elements for child abuse. The culpability elements remained as "knowingly," "intentionally" or "negligently" until 1980, when the legislature redefined the crime of child abuse. *See* note 20, *infra*.

cally inconsistent with the guilty verdict for reckless manslaughter because the former offense requires the culpable mental state of "knowingly" and the latter the culpable mental state of "recklessly." His argument, however, proceeds from a faulty assumption, namely, that the culpability element of one crime cannot exist simultaneously with the culpability element of another crime.

■ "Knowingly," in the context of the statutory definition of child abuse, requires an awareness of conduct or circumstance. Sections 18–1–501(6) and 18–6–401(1), C.R.S. 1973 (1978 Repl.Vol. 8). On the other hand, "recklessly," which is the requisite culpability for manslaughter, involves a conscious disregard of "a substantial and unjustifiable risk that a result will occur or that a circumstance exists." Sections 18–1–501(8) and 18–3–104(1)(a), C.R.S. 1973 (1978 Repl.Vol. 8). A person committing an act of felony child abuse may be aware that he is inflicting injury on the child while, at the same time, he is consciously disregarding the risk of death to the child from his abusive acts. Thus, there is no logical inconsistency between the guilty verdicts for the crimes of felony child abuse and reckless manslaughter.

■ The defendant next asserts that, with respect to the April 12 transaction, the guilty verdict for felony child abuse is inconsistent with his acquittal of extreme indifference murder and second degree murder. We disagree. Considering first the not guilty verdict for extreme indifference murder, the statutory definition of that offense in section 18–3–102(1)(d) [19] and the jury instruction based thereon included elements separate and distinct from those of child abuse. For example, extreme indifference murder required that the act be committed under circumstances manifesting extreme indifference to the value of human

life. A reasonable doubt on this or any other element of extreme indifference murder would not be inconsistent with a guilty verdict for felony child abuse.

■ We consider next the significance of the verdict of not guilty to second degree murder in relation to the defendant's claim of inconsistency. In keeping with the statutory definition of felony child abuse in section 18–6–401, the court's instruction to the jury defined the culpability element of "knowingly" in terms of the actor's awareness of his conduct or the circumstance in which he acted. In contrast, the statutory definition of second degree murder in section 18–3–103(1)(a) and the court's instruction on that crime define the culpability element of "knowingly" in terms of result—namely, an awareness that death is practically certain to follow from the actor's conduct. *See People v. Curtis*, Colo., 627 P.2d 734 (1981); *People v. Marcy*, Colo., 628 P.2d 69 (1981); *People v. Mingo*, 196 Colo. 315, 584 P.2d 632 (1978). Thus, the jury reasonably could be convinced beyond a reasonable doubt that the defendant was aware of his physical conduct towards the child (felony child abuse) and also could entertain a reasonable doubt as to whether the defendant was aware to a practical certainty that death would result to the child from his conduct (second degree murder).

■ Lastly, we consider the defendant's claim of inconsistency in the guilty verdicts for misdemeanor child abuse and third degree assault based on the transaction of January 30, 1978. Misdemeanor child abuse, like felony child abuse, defines the culpable mental state of "knowingly" in terms of conduct or circumstance; resulting bodily injury to the child, however, is not essential to a conviction for the misdemeanor offense. Section 18–6–401(7), C.R.S. 1973 (1978 Repl.Vol. 8).[20] The components

---

**19.** In *People v. Marcy*, Colo., 628 P.2d 69 (1981), we held the statutory definition of extreme indifference murder in section 18–3–102(1)(d), C.R.S. 1973 (1978 Repl.Vol. 8), violated equal protection of the laws under Article II, Section 25, of the Colorado Constitution because the offense was not sufficiently distin-

guishable from second degree murder to warrant the substantial differential in penalty authorized by the statutory scheme.

**20.** The legislature substantially amended the child abuse statute in 1980. Colo.Sess. Laws 1980, ch. 93, 18–6–401 at 544–45. Presently,

of third degree assault, as submitted to the jury and as defined in section 18–3–204, C.R.S. 1973 (1978 Repl.Vol. 8), consist of (1) acting "recklessly," and (2) causing bodily injury to another.[21] As noted previously, a person may be aware that his conduct is an endangerment to the child's life or health and, at the same time, may act "recklessly" by consciously disregarding the risk that bodily injury will result to the child from his conduct. Thus, there is no inconsistency in the verdicts finding defendant guilty of both misdemeanor child abuse and third degree assault.

The judgment is affirmed.

when a person acts knowingly or recklessly, except as to placing the child in a situation that may endanger its life or health, and the act of child abuse results in any injury other than serious bodily injury, it is a class 1 misdemeanor. If the person acts with criminal negligence, including the element of placing the child in a situation that may endanger its life or health, and the act of child abuse results in any injury other than serious bodily injury, it is a class 2 misdemeanor.

21.  " 'Bodily injury' means physical pain, illness, or any impairment of physical or mental condition." Section 18–1–901(3)(c), C.R.S.1973 (1978 Repl.Vol. 8).