The PEOPLE of the State of Colorado, Petitioner,

v.

Anthony L. DUNAWAY, Respondent.

No. 02SC675.

Supreme Court of Colorado, En Banc.

April 12, 2004.

Rehearing Denied May 3, 2004.*

* Justice MARTINEZ and Justice BENDER would grant the Petition.

Ken Salazar, Attorney General, Laurie A. Booras, First Attorney General, Appellate Division, Criminal Justice Section, Denver, Colorado, Attorneys for Petitioner.

David S. Kaplan, Colorado State Public Defender, Cynthia Camp, Deputy State Public Defender, Denver, Colorado, Attorneys for Respondent.

Justice KOURLIS delivered the Opinion of the Court.

## I. Introduction

In this case, we review the conviction of Anthony Dunaway for Child Abuse Resulting

in Serious Bodily Injury. The court of appeals reversed his conviction on the basis that the trial court instructed the jury on two alternative theories of culpability for the crime, and the evidence did not support both of those theories beyond a reasonable doubt. *People v. Dunaway,* No. 00CA1863, slip op. at 5 (Colo.App. June 13, 2002) (not selected for official publication). That court also concluded that, upon retrial, it would be error to admit expert opinion testimony on the amount of force typically required to cause a subdural hematoma such as the one the child victim here suffered. *Dunaway,* slip op. at 12.

We granted certiorari, and now reverse the court of appeals. We conclude, consistent with the United States Supreme Court's holding in *Griffin v. United States,* 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), that when a jury instruction includes two alternative factual theories of the same charged offense and the jury returns a general verdict of guilt, due process does not require reversal of that conviction merely because the evidence only supports one of the theories beyond a reasonable doubt. We also conclude that our holding in *People v. Martinez,* 74 P.3d 316 (Colo.2003), controls and that the trial court's admission of the expert testimony in this case was not error under *Martinez.* We therefore remand this case for reinstatement of the conviction.

## II. Facts and Procedural History

On the morning of February 19, 1999, Anthony Dunaway awoke at the home of his girlfriend, Kasey Grantham, after spending the night with her. Grantham and Dunaway had been dating each other for about five months. At that time, Grantham and her two children lived with her mother in her mother's house. Grantham's older child was then aged three, and her younger child, an infant, was then aged six months.[1]

Around 10:00 a.m. that morning, Grantham and Dunaway took a shower together. They left the two children alone in the living room, with the infant in his "exersaucer"[2] on the floor. Grantham's mother was not at home.

As Dunaway was getting out of the shower, both Grantham and Dunaway heard the baby crying. Wet and clothed only in his bath towel, Dunaway went to the living room to attend to the child. Grantham remained in the shower. As soon as he got to the living room, Dunaway hurriedly removed the baby from the exersaucer, and raised him up to eye-level. As he later demonstrated to police, Dunaway shook the baby "two to three times," paused, yelled "what's wrong?" and then slowly shook the baby one more time. Dunaway later explained to investigators that at this point, the baby "cried and arched his back [and] yawned . . . like he went to sleep."

Dunaway then inserted a pacifier into the baby's mouth and placed him in his car seat on the living room floor. According to her testimony at trial, sometime during these moments, Grantham heard the exersaucer "pop" as though the baby's feet had been stuck in the seat as he was being removed from the device. Immediately after the "pop," the crying stopped and Grantham continued bathing.

When Grantham got out of the shower, she walked to her bedroom to get dressed, passing the baby in the car seat on the way. She believed at the time that the baby was taking a nap. While Grantham was getting dressed, Dunaway came into the bedroom and informed her that the baby was snoring "kind of funny."

Curious, Grantham immediately went to check on the baby and noticed that the snoring was unusual; the baby repeatedly took short, staccato breaths followed by grunts. Grantham listened to the baby's unusual breathing for about a minute before she

---

1. To protect the child's anonymity, the younger child, the victim in this case, will be referred to interchangeably as: the "child," the "infant," or the "baby."

2. The exersaucer is a stationary infant play device that contains a rotating cushioned seat sur-

rounded by a circular table-like surface allowing the child to keep small toys within his reach. Below the circular table and seat, connected by three arms, is a saucer that flexes to allow for playful movement of the infant's legs.

picked him up. When she raised the baby out of the car seat, he went limp and his eyes remained half shut. The grunting continued. According to Grantham, the baby appeared as though "he wasn't there."

Grantham began to panic. She yelled out to Dunaway that she should call 911 or her mother. Dunaway responded: "No, no, he's fine. He's fine. He's going to wake up. He's fine. It's okay. He's fine. You don't need to call anybody he's fine." Grantham and Dunaway then placed the baby on the floor and undressed him. Dunaway began to yell in the baby's ears: "Wake up!" When the baby failed to respond, Grantham telephoned her mother, who dialed 911.

Both police and paramedics arrived about five minutes later, at 11:26 a.m. Upon their arrival, the baby was alternating between a state of motionlessness and fits of screaming; they immediately determined that the baby was suffering from frequent seizures. The baby was rushed to Lutheran Hospital. Emergency room doctors quickly determined the baby was critically ill and unconscious. A CAT scan revealed that the baby was bleeding in his brain.

Later that day, the baby was transferred to Children's Hospital. There, doctors diagnosed the baby as having a blood clot "inside the head on the outside surface of [his] brain," a condition also known as a "subdural hematoma."[3] Doctors concluded that this injury was causing the baby's retinal bleeding and seizures.[4]

The police interviewed Dunaway at both hospitals, where he was awaiting news of the baby's condition with Grantham. At the second interview, Dunaway recounted most of the events above, and demonstrated how he shook the baby earlier that day. When police explained the baby's diagnosis to Dunaway, he recalled a fall off the couch the baby had taken within the previous month and he attributed the injury to that fall. Police arrested Dunaway the same day. On February 26, 1999, Dunaway was charged with one count of Child Abuse Resulting in Serious Bodily Injury[5] and one count of Child Abuse.[6]

At trial, the prosecution presented evidence to the jury to prove that Dunaway shook the baby and that the shaking caused the baby's subdural hematoma. To this end, it presented an expert who testified that a subdural hematoma can only be caused by a violent blow to the head; she related several extreme accident scenarios in order to provide a foundation for such testimony. The prosecution also presented the testimony of several medical experts, some of whom testified that a subdural hematoma must always be treated immediately.

During its closing, the prosecution invited the jury to find that Dunaway was liable for Child Abuse Resulting in Serious Bodily injury both because he caused serious bodily injury to the child in this case and because he permitted the child to be placed in an injury-threatening situation when he attempted to prevent the child's mother from seeking medical treatment for the child. On July 12, 2000, a jury convicted Dunaway of Child Abuse Resulting in Serious Bodily Injury on a general verdict form. Dunaway was sentenced to fourteen years' imprisonment.

Dunaway appealed his conviction to the court of appeals arguing, among other things, that: (1) the trial court improperly instructed the jury on the charge of Child Abuse Resulting in Serious Bodily Injury because one of the alternative theories of liability in the jury instruction—that Dunaway permitted the child to be unreasonably placed in an

---

**3.** Doctors also reported that the baby had bruises on his buttocks and a week-old shin bone fracture, which was healing. Although the jury heard evidence about these injuries at trial, they were not part of the charge against Dunaway and are not pertinent to this opinion.

**4.** After approximately five months of medication and medical monitoring, the baby's seizures and the retinal bleeding ceased. At the time of trial, the baby was in relatively good health, although

doctors believe that he is at risk for developmental delay; his condition will need to be monitored "over time."

**5.** § 18–6–401(1)(7)(a)(III), 6 C.R.S. (2003).

**6.** § 18–6–401(1)(7)(a)(V), 6 C.R.S. (2003). This lesser charge, ultimately rejected by the jury, was added on November 23, 1999.

injury-threatening situation—was not supported by sufficient evidence; and (2) the trial court improperly permitted the expert testimony concerning the violent accident scenarios on the grounds that such testimony was overly prejudicial to Dunaway. The court of appeals agreed with Dunaway concerning the jury instruction and reversed his conviction on that basis. *Dunaway*, slip op. at 5. The court of appeals also held that, on retrial, the trial court should not allow expert testimony suggesting that the force that caused the baby's subdural hematoma was comparable to the force present in other violent accidents. *Dunaway*, slip op. at 12.

We accepted certiorari,[7] and now hold that the law does not require that sufficient evidence support each alternative theory of liability present in the jury instruction on Child Abuse Resulting in Serious Bodily Injury. Rather, as long as the evidence supports one of the theories of liability beyond a reasonable doubt, Dunaway's trial was not fundamentally unfair. We also determine that the district court did not commit plain error in permitting the prosecution's experts to testify about matters related to the baby's subdural hematoma. Accordingly, we now reverse the court of appeals' decision, and remand the case for reinstatement of Dunaway's conviction.

## III. Jury Instruction

Dunaway first argues that the instruction given to the jury on Child Abuse Resulting in Serious Bodily Injury was unconstitutional. He contends that even though the instruction accurately reflected the statute upon which it was based, it was infirm because it contained an alternative theory of liability that was not supported by evidence at trial of guilt beyond a reasonable doubt. Dunaway asserts that under this court's prior decision in *James v.*

*People*, 727 P.2d 850 (Colo.1986), the erroneous instruction violated his right to due process, warranting a reversal of his conviction. The People, however, argue that both theories of liability presented to the jury were supported by sufficient evidence and thus, that *James* does not apply in this case. The People alternatively argue that even if one of the theories of liability was not supported by sufficient evidence in violation of *James*, that the later United States Supreme Court decision in *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), undercuts the rationale in *James* and commands a different result. We granted certiorari on this question and now overrule *James* to the extent its reasoning conflicts with *Griffin.*

### A. Sufficiency of the Evidence

The jury in this case convicted Dunaway of one count of Child Abuse Resulting in Serious Bodily injury. The complaint on this charge alleged that

> [o]n February 19, 1999, in the . . . State of Colorado, ANTHONY LEE DUNAWAY did unlawfully, knowingly and recklessly, cause an injury to, and permit to be unreasonably placed in a situation which posed a threat of injury to, the life and health of a child . . . resulting in serious bodily injury to the child; contrary to . . . Section 18–6–401(1)[ (a) and](7)(a)(III), 6 C.R.S. (2003).

Subsection (1)(a) of section 18–6–401, as applied, states that "[a] person commits child abuse if such person causes an injury to a child's life or health, or permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health." Subsection (7)(a)(III) of that statute provides that "[w]here death or injury results, . . . [w]hen a person acts knowingly or recklessly and the child abuse results in

7. We accepted certiorari on the following issues:
 1) Whether the holding in *James v. People*, 727 P.2d 850 (Colo.1986), that due process of law requires evidence sufficient to support a verdict by proof beyond a reasonable doubt of each alternative method of committing an offense, is still valid in light of *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991);
 2) Whether the court of appeals erred in holding that this case falls within the scope of

*James* in conflict with *People v. Pineda*, 40 P.3d 60 (Colo.App.2001);
 3) Whether the court of appeals erred by holding, under *James* that there was insufficient evidence to support alternative methods of committing the offense of child abuse; and
 4) Whether the court of appeals erred by applying *People v. Martinez*, 51 P.3d 1046 (Colo. App.2001), to rule that expert testimony concerning injuries to shaken babies was improperly admitted.

serious bodily injury to the child, it is a class 3 felony."

At the close of trial, the court instructed the jury on the charge of Child Abuse Resulting in Serious Bodily Injury as follows:

The elements of the crime of Child Abuse Resulting in Serious Bodily Injury are: (1) That the defendant, (2) in the State of Colorado, at or about the date and place charged, (3) knowingly or recklessly, *(4) caused an injury to a child, or (5) permitted a child to be unreasonably placed in a situation which posed a threat of injury to a child's life or health,* (6) which resulted in serious bodily injury to the child. After considering all the evidence, if you decide the prosecution has proven each of the elements beyond a reasonable doubt, you should find the defendant guilty of Count One: Child Abuse Resulting in Serious Bodily Injury. [ ] After considering all the evidence, if you decide the prosecution has failed to prove any one or more of the elements beyond a reasonable doubt, you should find the defendant not guilty. . . .

(emphasis added). This instruction restates the first two bases of liability listed within the Child Abuse statute itself, § 18-6-401(1)(a), 6 C.R.S. (2003). The instruction also reflects alternative theories of liability for the same charged offense, the first of which is that the defendant caused an injury to the child, and the second of which (reflecting the "endangerment clause" of the statute) is that the defendant permitted the child to be unreasonably placed in a situation that posed a threat of injury to the child. It also follows subsection 7(a)(III), which requires the class 3 felony conviction to be supported by a finding that serious bodily injury resulted from the conduct listed under subsection (1)(a).

■ We have previously interpreted the endangerment clause of section 18-6-401(1)(a) to "protect children, who frequently are unable to care for themselves, from the risk of injury or death associated with conduct that places a child in a situation that poses a threat to the child's well-being." *Lybarger v. People,* 807 P.2d 570, 578 (Colo. 1991). We have also stated that "knowingly" under the statute "refers to the actor's general awareness of the abusive .nature of his conduct in relation to the child or his awareness of the circumstances in which he commits an act against the well-being of the child." *People v. Noble,* 635 P.2d 203, 210 (Colo.1981). As pertinent to the endangerment clause, "a person acts 'recklessly' when he consciously disregards a substantial and unjustifiable risk that, in light of the child's circumstances, a particular act or omission will place the child in a situation which poses a threat of injury to the child's life or health." *Lybarger,* 807 P.2d at 575. Importantly, "the culpable mental states applicable to a crime of child abuse relate not to a particular result but rather to the nature of the offender's conduct in relation to the child or to the circumstances under which the act or omission occurred." *Id.*

■ Where death or serious bodily injury results, a defendant may be charged with class 2 or class 3 felony child abuse if the prosecution presents sufficient evidence that would, "when viewed in the light most favorable to the prosecution, . . . induce a person of ordinary prudence and caution to entertain a reasonable belief that the defendant acted knowingly or recklessly" in relation to the alleged act or omission. *People v. Dist. Court,* 803 P.2d 193, 196–97 (Colo.1990). To assess the sufficiency of the evidence supporting the guilty verdict on that charge, we "must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of the accused's guilt beyond a reasonable doubt." *People v. Sprouse,* 983 P.2d 771, 777 (Colo.1999). The verdict must ultimately be upheld if there is sufficient evidence to support it. *People v. Schoondermark,* 699 P.2d 411, 414 (Colo.1985).

■ Dunaway does not dispute the sufficiency of the evidence in support of the theory that he knowingly or recklessly caused serious bodily injury to the infant in this case. Because there is ample evidence in the record to support a conviction on that theory beyond a reasonable doubt, we conclude that Dunaway was properly convicted under the prosecution's first theory of liability—know-

ingly or recklessly causing an injury to the child's life or health.

Dunaway claims instead that there was insufficient evidence as to whether he unreasonably placed the infant in an injury-threatening situation. On this point, the prosecution argues, as they specifically informed the jury at trial without objection from Dunaway, that Dunaway's successful attempt to delay the medical care of the child constitutes sufficient evidence to support the second theory. Dunaway argues that there was no evidence presented to the jury upon which they could have found that he caused a delay in seeking medical treatment for the child.

We have previously held that a failure to seek medical treatment for a child who has been seriously injured may constitute child abuse under the endangerment clause of section 18-6-401(1)(a). In *People v. Dist. Court,* we stated that "[b]ecause child abuse encompasses mistreatment by inaction as well as action, we have recognized that child abuse occurs when a person's inaction creates circumstances that threaten a child's well-being." 803 P.2d at 197. We have further held that among the myriad injuries to children that the endangerment clause works to protect against are "those conditions which if medically untreated may result in a significant impairment of vital physical or mental functions, protracted disability, permanent disfigurement, or similar defects or infirmities." *Lybarger,* 807 P.2d at 578.

In this case, the jury was presented with evidence sufficient to prove that Dunaway violently shook the baby. The evidence also showed that after he shook the baby, the baby's condition worsened and Dunaway was aware of the seriousness of that condition. Indeed, Stephanie Stronks Knapp, a clinical social worker at Children's Hospital, who interviewed Dunaway on February 19, 1999, recounted for the jury Dunaway's description of the child's behavior just after the shaking—behavior that matched several experts' descriptions of a typical seizure resulting from a subdural hematoma.

Expert testimony also revealed that the baby's immediately resulting injury was such that if left untreated, it would have created serious complications for the child. Several experts testified that a subdural hematoma is typically accompanied by brain swelling and resulting seizures, as was the case here. One expert, a pediatric neurosurgeon, testified that symptoms of a subdural hematoma can occur within minutes of violent trauma. Another expert, an emergency room physician who treated the baby in this case, testified that a subdural hematoma will cause the brain to swell, causing seizures and "killing off" portions of the brain. A third expert, Dr. Patti Rosquist, a pediatrician and member of the Children's Hospital "Child Protection Team," testified that because a seizure raises the brain's demand for oxygen, it is "very important to stop the seizure."

We must view the facts of this case in the light most favorable to the prosecution. *Schoondermark,* 699 P.2d at 414. From that viewpoint, the evidence shows that Dunaway was aware that the baby was having seizures and that he failed to seek medical treatment for the child. As the only adult privy to the baby's changed condition, he chose to leave the baby alone in the living room, actively concealing any evidence of the baby's changed condition. While he eventually made the baby's mother aware that the baby's behavior was unusual, he tried to diminish the baby's symptoms by telling her that the child was "snoring kind of funny." Additionally, he attempted to prevent the child from receiving medical treatment when he urged the mother not to call 911, despite his awareness of the seriousness of the baby's condition.

Accordingly, we conclude that the evidence was sufficient to cause a juror of reasonable prudence to conclude that: (1) the child was suffering an injury that if left medically untreated was likely to result in significant physical or mental impairment or infirmity; and, (2) that Dunaway knowingly or recklessly caused a delay in the treatment of that injury by failing to seek treatment for the child, by actively concealing the seriousness of the injury, and by attempting to prevent the child from receiving treatment. These combined circumstances constitute evidence sufficient to support a finding that Dunaway

permitted this child to be unreasonably placed in a situation posing a threat of injury to his life or health under subsection 18–6–401(1)(a).

Nevertheless, we agree with Dunaway and the court of appeals that the evidence in this case was insufficient to support a conviction on this theory of liability as charged and tried.[8] Because Dunaway was charged under section 18–6–401(7)(a)(III), the prosecution was required to prove that by permitting the child to be unreasonably placed in a situation posing threat of injury to the child's life or health, Dunaway's actions resulted in serious bodily injury to the child.

The prosecution failed to present evidence that the delay in the child's medical treatment resulted in serious bodily injury to the child. While the evidence (at most) shows that it was critically important to treat the injury as soon as possible, no expert testified that the delay aggravated the injury already present or created other serious bodily injury to the child. There was not even the suggestion that every second or every minute counts in treating an infant's subdural hematoma.

Affording every reasonable inference to the prosecution, approximately 1.5 hours transpired between the shaking of the baby and the arrival of paramedics at the child's house. Thus, Dunaway failed to seek, delayed, and attempted to prevent the child's medical treatment during a period lasting 1.5 hours. While the baby's seizures appeared to have begun immediately after the shaking, the baby's treating physicians explained that when the baby was discharged from the hospital over a month later, he was still being treated for those seizures. Indeed, the child was still being treated for seizures for over five months after the onset of the hematoma.

No one explained whether the 1.5 hour delay made it more difficult to treat the seizures and no one explained whether the delay had or will have any effect on the child's long-term health. The evidence showed only that it was the shaking that caused serious and potentially permanent injury to the child—not the failure to seek medical treatment instantaneously for him.

■ Accordingly, for this particular theory of liability, the prosecution made no causal connection between the injury element of the statute, § 18–6–401(7)(a)(III), and the act element of the statute, § 18–6–401(1)(a). It is axiomatic that the prosecution must prove every element of a charged crime beyond a reasonable doubt. *People v. Snyder*, 874 P.2d 1076, 1080 (Colo.1994). The People ask us to infer proof of the injury element of section 18–6–401(7)(a)(III) from proof relating to section 18–6–401(1)(a). Specifically, they contend that as a matter of law, proof of delay in medical treatment for a serious injury necessarily proves that the delay resulted in additional serious bodily injury, thus satisfying any causal requirement of the statute.

However, the legislature specifically contemplated and provided for those situations where the prosecution establishes proof of section 18–6–401(1)(a) but without a resulting injury. As applicable here, section 18–6–401(7)(b) provides that "[w]here no death or injury results, ... [a]n act of child abuse when a person acts knowingly or recklessly is a class 2 misdemeanor." Similarly, section 18–6–401(7)(a)(V) states that "[w]hen a person acts knowingly or recklessly and the child abuse results in any injury other than serious bodily injury, it is a class 1 misdemeanor." Accordingly, no reasonable interpretation of subsection (1)(a) would lead to the conclusion that proof of injury or serious bodily injury is made or inferred through

---

**8.** We note that two of our prior cases would support a conclusion that the various theories of liability listed in a prior version of the child abuse statute, section 18–6–401(1)(a), 6 C.R.S. (2003), might be interchangeable or overlapping, thus obviating the need to determine the sufficiency of the evidence on both if the evidence is sufficient on one. *See People v. Noble*, 635 P.2d 203, 211 (1981); *see also People v. Taggart*, 621 P.2d 1375, 1387 (1981). Both of those cases dealt with the defendant's right to a unanimous

verdict, and not the question of whether each theory must be supported by sufficient evidence. Indeed, the *James v. People*, 727 P.2d 850 (1986), line of cases, which we today overrule, cited *Taggart* with disfavor. 727 P.2d at 854–55. Since we today address the broader question of whether evidence must support each charged theory within a jury instruction, we decline to rest our holding on a narrower subset of cases involving child abuse only.

proof of the conduct listed in subsection (1)(a).

The People also appear to contend alternatively that the prosecution had clearly established the existence of serious bodily injury in this case, thus proving that element for all theories of "child abuse" presented to the jury under subsection (1)(a). That interpretation of section 18–6–401 would circumvent the statute's plain meaning. Subsection (7)(a) renders the alleged "child abuse" eligible for a class 3 felony conviction when "the child abuse results in serious bodily injury." Subsection (1)(a) defines "child abuse" as comprising any one of three very different forms of conduct, including those situations where a person "permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health." A plain reading of subsection (7)(a), then, only makes a person eligible for a class 3 felony conviction for permitting the child to be unreasonably placed in an injury-threatening situation where doing so results in serious bodily injury; it specifically links subsection (7)(a) to subsection (1)(a) and plainly requires a causal connection between the two. We would have to disregard the statute's plain language to permit proof of (7)(a) based on proof of serious bodily injury in the abstract.

Because a class 3 felony conviction under section 18–6–401(1)(a) requires a causal connection between each listed form of "child abuse" and the alleged serious bodily injury, and because the prosecution failed to make that connection between the situation that posed a threat of injury to the child in this case and a resulting serious bodily injury, we conclude that the prosecution lacked sufficient evidence on this second alternative theory of liability.

Because the jury in this case was instructed under both theories of liability and because one of those theories was not supported by sufficient evidence, Dunaway insists that the instruction caused jury confusion and that under *James,* his right to procedural due process was violated. Thus, he asks this court to affirm the court of appeals' decision reversing his conviction.

## B. Viability of *James v. People* in light of *Griffin v. United States*

### 1. *James v. People*

In *James,* we held that because due process requires a conviction to be based upon proof beyond a reasonable doubt, all alternative theories of liability listed in a jury instruction must be supported by sufficient evidence where the verdict is returned on a general verdict form. 727 P.2d at 853. In *James,* the defendant objected at trial to a jury instruction that allowed the jury to convict the defendant "if he had knowingly inflicted sexual penetration upon the victim by causing her to submit to him in one of three ways: (1) application of physical force or violence, (2) threat of imminent death, or (3) threat of future retaliation." *Id.* This instruction accurately stated the first three grounds of liability of first degree sexual assault listed in section 18–3–402(1), 8B C.R.S. (1986 Supp.). The trial court rejected the defendant's argument in that case and the jury returned a verdict of guilt on a general form that did not specify any one of the three alternative theories of liability. *Id.* at 852.

We noted that we were unable to determine with absolute certainty which alternative theory of liability the jury applied to convict the defendant. *Id.* at 853. Thus, without sufficient evidence supporting each of the alternative theories of liability, we held that "there can be no assurance that the general verdict is based upon that constitutional standard mandated by the due process clauses of both the federal and state constitutions." *Id.* Nevertheless, because there was sufficient evidence in the record to support a jury verdict on all three alternative methods of illegally causing submission, we upheld the defendant's conviction. *Id.* at 856.

### 2. *Griffin v. United States*

Five years after *James,* the U.S. Supreme Court decided *Griffin,* in which it held unanimously that the due process clause of the U.S. Constitution does not require reversal of a general verdict merely because there is not sufficient evidence to support one of the alternative theories of liability identified in a

jury instruction. 502 U.S. at 59–60, 112 S.Ct. 466. In that case, the defendant was on trial for conspiracy and the instruction identified two alternative theories of culpability. There was sufficient evidence to support one of the theories, and not the other. *Id.* at 48, 112 S.Ct. 466.

The Court explained that prosecutors historically charged defendants in the alternative in order to avoid the pitfalls of duplicative pleading. *Id.* at 51, 112 S.Ct. 466. The Court observed:

> A statute often makes punishable the doing of one thing *or* another, . . . sometimes thus specifying a considerable number of things. Then, by proper and ordinary construction, a person who in one transaction does all, violates the statute but once, and incurs only one penalty. Yet he violates it equally by doing one of the things.

*Id.* (quoting 1 J.Bishop, New Criminal Procedure § 436 (2d ed.1913)). Under this practice, the prosecution could allege, in one count, "that the defendant did as many of the forbidden things as the pleader chooses, employing the conjunction *and* where the statute has 'or,' and it will not be double, and it will be established at the trial by proof of any of them." *Id.* The Court concluded that as long as the prosecution is held to its burden of proving each *element* of the offense beyond a reasonable doubt, due process is *not* offended if one of the alternative bases of liability contained within an element is not also supported by sufficient evidence. *See id.* at 59–60, 112 S.Ct. 466.

In *Griffin,* the Court took great care to distinguish between jury instructions that provide a *legally inadequate* basis of liability, which are violative of due process, and instructions that merely provide a *factually inadequate* basis of liability, which are not. *Id.* at 59, 112 S.Ct. 466. The Court remarked:

> It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance—remote, it seems to us—that the

jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient.

*Id.* at 59–60, 112 S.Ct. 466 (quoting *United States v. Townsend,* 924 F.2d 1385, 1414 (7th Cir.1991)). The Court explained that "[j]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law." *Id.* at 59, 112 S.Ct. 466. However, "[q]uite the opposite is true . . . when they have been left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence." *Id.*

 Thus, because jurors should be trusted to follow the court's instructions to find the defendant guilty only if the prosecution has proved each of the elements of the charged crime beyond a reasonable doubt, federal due process does not require reversal of a conviction on the basis of the very remote possibility that one of the alternatives in the instruction may have misled the jury into handing down an erroneous conviction. *Id.* at 59–60, 112 S.Ct. 466. While the Court noted that the better practice is for the court to remove from the instruction a theory of liability that is not supported by sufficient evidence, the fact that the court fails to do so "does not provide an independent basis for reversing an otherwise valid conviction." *Id.* at 60.

### 3. *James* after *Griffin*

Under *Griffin,* then, the due process clause of the U.S. Constitution does not require a reversal of Dunaway's conviction. Dunaway does not dispute that there was sufficient evidence presented to the jury in this case to support a conviction of Child Abuse Resulting in Serious Bodily Injury which would satisfy the elements of the offense.[9]

Rather, having not objected to the instruction at trial, Dunaway now contends that because the evidence did not support one of the alternative theories of liability within an

---

9. Elements (4) and (5) of the jury instruction are disjunctive, such that proof of one would be sufficient.

**630**

element of the instruction, his due process rights were violated. Under *Griffin*, his argument is untenable and alleges no plain error. The instruction required the jury to convict only if the jury found that the prosecution had proved each of the statute's elements beyond a reasonable doubt. Here—as in *Griffin*—there is ample evidence in the record to support a conviction based on each of those elements. Because we should assume under *Griffin* that the jury was well-equipped to assess the prosecution's evidence, we should presume that it convicted Dunaway upon the theory that was supported by sufficient evidence and not presume that it was misled into convicting Dunaway on the theory that was not supported by sufficient evidence.

The court of appeals, however, reversed Dunaway's conviction under *James* and made no mention of the Supreme Court's decision in *Griffin*. Dunaway insists that this decision was correct because *James* was based on state constitutional due process, Colo. Const. art. II § 25, and not federal due process, as was the case in *Griffin*. While we agree that *James* and *Griffin* would yield different results in this case, we are not persuaded that any inconsistency between *James* and *Griffin* should be decided in favor of *James*.

In *James*, we stated that the due process standard that requires a criminal conviction to be supported by proof beyond a reasonable doubt also required sufficient evidence to support each alternative theory of liability in a general verdict under "both the federal and state constitutions." 727 P.2d at 853. Apart from this passing reference to state due process, we relied almost exclusively upon federal law to announce that holding. Indeed, in stating that "[m]any other courts that have considered this issue directly have reached the same conclusion," we cited to several U.S. Supreme Court cases that stood only for the proposition that a jury cannot render a general verdict following an instruction containing a legally erroneous alternative theory. *Id.* at 853–54 (citing to, among others, *Leary v. United States*, 395 U.S. 6, 89

S.Ct. 1532, 23 L.Ed.2d 57 (1969), *Bachellar v. Maryland*, 397 U.S. 564, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970), *Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), and *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931)). These cases were all directly distinguished in *Griffin* as supporting only the contention that due process will not sustain a jury instruction containing a legally (not factually) erroneous theory of liability. *Griffin*, 502 U.S. at 52–56, 112 S.Ct. 466.; *see also People v. Rodriguez*, 914 P.2d 230, 273 (Colo.1996) (citing to *James* and holding that an instruction containing a legally inaccurate alternative theory of liability constituted plain error). In *Griffin*, the Court determined that such cases had no bearing on cases in which the jury returned a general verdict based upon an instruction that contained a factually inadequate theory. 502 U.S. at 52–56, 112 S.Ct. 466.

Because we explicitly relied on federal due process precedent in *James* and referenced both the state and federal constitutions, we must acknowledge that *James* now rests on unstable ground.

■ We are, of course, aware that the Colorado Constitution may afford greater due process protections to a criminal defendant than the U.S. Constitution. *People v. Dist. Court*, 834 P.2d 181, 193 (Colo.1992). We are also aware that the fundamental difference between *James* and *Griffin* is the amount of certainty that due process requires in order to sustain a conviction. *James* held that due process requires absolute certainty that the conviction was based upon proof beyond a reasonable doubt. 727 P.2d at 853. *Griffin* later clarified the requirements of due process and held that due process will tolerate some remote uncertainty. 502 U.S. at 59–60, 112 S.Ct. 466.

■ Where the analogous federal and state constitutional provisions are textually identical, we have always viewed cases interpreting the federal constitutional provision as persuasive authority.[10] *See, e.g., People v.*

10. The due process clauses of the U.S. and Colorado Constitutions are indeed identical. *Compare* U.S. Const. amend V ("No person shall ... be deprived of life, liberty, or property, without

*Hillman*, 834 P.2d 1271, 1274 n. 9 (Colo. 1992); *People v. Dist. Court*, 834 P.2d at 193 n. 13. Apart from cases addressing the shifting of burdens in affirmative defenses, *see, e.g., People ex rel. Juhan v. Dist. Court*, 165 Colo. 253, 439 P.2d 741 (Colo.1968), our past decisions concerning the due process requirement of proof beyond a reasonable doubt have consistently aligned the requirements of our own constitution with those of the U.S. Constitution. *E.g., Griego v. People*, 19 P.3d 1, 7 (Colo.2001) (discussing the prosecution's burden of proving beyond a reasonable doubt every element of a charged offense); *People v. Hill*, 934 P.2d 821, 828–29 (Colo.1997) (discussing the nature of the prosecution's burden to disprove defendant's insanity); *Jolly v. People*, 742 P.2d 891, 896 (Colo.1987) (rejecting under both the federal and state constitutions the use of presumptive—as opposed to permissive—inferences against a criminal defendant); *People v. Hill*, 182 Colo. 253, 512 P.2d 257, 257–58 (1973) (holding that under both state and federal due process, all criminal juries must be instructed on the presumption of innocence in addition to an instruction on the prosecution's burden of proof).

■■■ We now conclude that *Griffin* applies in this case, and to the extent *James* is inconsistent with *Griffin*, we overrule *James*.[11] Accordingly, we conclude that permitting an instruction on an alternative theory of liability for the same charged offense not supported by sufficient evidence does not rise to the level of a constitutional error where the conviction for that offense is otherwise supported by sufficient proof.[12] Under due process, a criminal defendant is "entitled to a fair trial, but not a perfect trial." *People v. Barker*, 180 Colo. 28, 33, 501 P.2d 1041, 1043 (Colo.1972). Thus, we are not compelled to deviate from tradition to protect against the remote possibility of error presented in this case.

We hold that, where the evidence presented at trial against a criminal defendant is otherwise sufficient to support the determination of guilt, providing the jury with an instruction containing a factually insufficient theory of liability for the same charged offense does not alone violate the due process clause of the Colorado Constitution.

## IV. Expert Testimony

■■■ Dunaway finally argues that the district court abused its discretion in permitting Dr. Patti Rosquist, a prosecution expert, to testify about subdural hematoma and its relation to other violent accidents. At trial, Dr. Rosquist explained that most studies of infant subdural hematoma were based on results from accidental injuries. She explained that because it would obviously not be possible to test a child's response to intentional injury, it was impossible to know what minimum force was required to cause an infant's subdural hematoma.

Dr. Rosquist did testify, however, that she believed massive force was required to cause infant subdural hematoma. She explained:

> We have many studies with babies with subdural hematomas from accidental inju-

due process of law.") *with* Colo. Const. art. II § 25 ("No person shall be deprived of life, liberty or property, without due process of law.").

11. Dunaway also argues that *James* specifically raised and dismissed the crucial reasoning in *Griffin*, and, thus, contends that we have already considered and rejected the People's argument in this case. For this proposition, he points to a footnote in *James*, 727 P.2d at 854 n. 3, in which we disapproved of *Turner v. United States*, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970)—a case he characterizes as directly on point with *Griffin*. We view *Turner* as inapposite. *Turner* addressed whether an element of an offense could be proved inferentially merely by proving another element of the charged offense. 396 U.S. at 408–09, 90 S.Ct. 642. There, the U.S. Supreme Court held that in the absence of any rebuttal evidence, the prosecution's failure to prove that element separately did not violate due process. *Id.* at 409, 90 S.Ct. 642. Thus, *Turner* addressed whether due process required in that instance the prosecution to prove every element of the charge; it did not address the situation here, where the prosecution *has* proved every element of the charged offense. Therefore, we did not reject the reasoning upon which *Griffin* was ultimately based.

12. Because we determine that the error in this case—if any—does not rise to the level of a constitutional error, we need not address whether the error is a trial error or structural error as contemplated by *Griego v. People*, 19 P.3d 1, 7–8 (Colo.2001).

ries and they're such things as falling from a several story building or being in a high speed motorcycle accident or a child say is on a bicycle hit by a car. So, in other words, when we see subdurals in accidental injury, it's from a major trauma. It requires massive force.

. . .

There is always the classic question of how much force does it take, and, unfortunately, we can't do these studies on babies and measure the force. So I can't tell you exactly in a number how much force [it takes to cause a subdural hematoma]. Rather, what we have to do is infer from the witnessed accidental injuries that resulted in similar injuries. And those, as we talked about a little bit before, are falls from major heights. One of the witnessed fall [sic] was from a seven-story building that resulted in a subdural hematoma like this, or the high speed motor vehicle accidents. Children who are ejected from vehicles. Pedestrians who are hit by vehicles. That kind of thing. So I have to say it's a similar magnitude of force, but I cannot tell you how much force · that is.

Dunaway did not object to this testimony at trial.[13]

In its opening statement, the prosecution told the jury that during the trial, doctors would inform them about "[t]he force it takes to make a baby's brain bleed." In its closing argument, the prosecution called Dunaway's act of shaking the baby "a moment of violent action."

Dunaway now insists that both the above portion of Dr. Rosquist's testimony and any references to that testimony by the prosecution were inadmissible. He contends that the testimony was irrelevant to the facts at issue in the case (whether Dunaway caused the injury to the baby), that it was unfairly prejudicial, and that it was not reliable. He therefore claims that the district court

abused its discretion in admitting the testimony. While we agree with Dunaway that Dr. Rosquist's testimony contained an improper inference, we do not agree that this single inference justifies a reversal in this case.

Relying on another court of appeals panel's holding in *People v. Martinez,* 51 P.3d 1046 (Colo.App.2001), the court of appeals here agreed with Dunaway and held that on retrial, the district court should exclude any testimony similar to Dr. Rosquist's. *Dunaway,* at slip op. at 11–12. However, we granted certiorari on the court of appeals decision in *Martinez,* and we reversed. *People v. Martinez,* 74 P.3d 316 (Colo.2003). While our decision in *Martinez* applies here, it does not require a reversal of Dunaway's conviction.

We note at the outset that "[t]rial courts are vested with broad discretion to determine the admissibility of expert testimony, and the exercise of that discretion will not be overturned unless manifestly erroneous." *Martinez,* 74 P.3d at 322. Further, where the defendant fails to object to the evidence at trial, as here, we review the alleged error under a plain error standard. *People v. Dunlap,* 975 P.2d 723, 737 (Colo. 1999). Under the plain error standard, this court will reverse a trial court's error only where it so affected the trial as to render it fundamentally unfair, casting "serious doubt on the reliability of the judgment of conviction." *People v. Garcia,* 28 P.3d 340, 344 (Colo.2001).

In *Martinez,* we specifically reviewed the admissibility of violent accident scenarios as they relate to an infant victim's subdural hematoma. In that case, the prosecution offered the testimony of an expert—the very expert who testified in this case—who explained that a subdural hematoma "requires massive, violent force." 74 P.3d at 320.

---

**13.** Although Dunaway filed a motion in limine prior to trial seeking to exclude testimony concerning the general symptoms of "shaken baby syndrome," it was a broad motion, questioning the very existence of such a condition. He made no reference to subdural hematoma, an injury he later distinguished for the court and whose legitimacy he does not dispute, nor did he refer to how any testimony would discuss the amount of force required to cause the injury at issue in this case. The motion also did not refer to the testimony of any specific expert; instead it sought to exclude all testimony relating to "shaken baby syndrome" under C.R.E. Rules 401, 403, and 702. Dunaway made no later objections relating in any way to the testimony of Dr. Rosquist.

When asked to explain "massive, violent force" by way of comparison to other "real-life accident scenarios," the defendant objected on grounds that such testimony would be misleading and irrelevant under C.R.E. 403. *Id.*

The trial court in *Martinez* overruled the defendant's objection and permitted the expert there to testify

that a subdural hematoma rarely occurs and does so only in limited situations: where a baby falls from a several story building; in a high-speed motor vehicle accident either as a pedestrian or where the baby is unrestrained; or when a baby is violently shaken or violently shaken and slammed.

*Id.* At no point did that expert opine as to the minimum amount of force required to cause a subdural hematoma to a baby who has been shaken. *Id.* In its closing argument, however, the prosecution in *Martinez* concluded that based on this expert testimony, the defendant must have used an amount of force comparable to that described in the expert's accident scenarios. *Id.*

On appeal to this court, we upheld the trial court's admission of this testimony. Citing to *People v. Shreck*, 22 P.3d 68 (Colo.2001), we held that an expert's use of accident scenarios is admissible under C.R.E. Rules 702 and 403 as long as it is used solely to assist the jury in understanding the nature of a subdural hematoma. *Martinez*, 74 P.3d at 322–23. Because it was undisputed that a subdural hematoma is necessarily caused by a "massive, violent force," we held that the expert's testimony—including her accident scenarios—provided the jury a basis to understand her opinion that massive, violent force was required to cause a subdural hematoma. *Id.* at 323–24. Thus, her opinion was helpful to an understanding of the facts of the case. *Id.* at 324. Accordingly, the testimony was admissible under C.R.E. 702. *Id.*

Further, because the expert did not intimate that the force present in the accident scenarios was equivalent to the force used in that particular case, we determined that the evidence was not misleading and that the court had not abused its discretion under C.R.E. 403 in admitting it. *Id.* at 324–25.

We did note in *Martinez* that the prosecutor had improperly used that testimony to infer for the jury that the injury at issue in that case was caused by force comparable to that present in the expert's accident scenarios. *Id.* at 325–26. However, because the testimony was otherwise admissible to show the basis of the expert's opinion, an improper inference in closing argument alone did not later make the evidence inadmissible. *Id.* at 326.

Here, Dr. Rosquist's expert testimony was clearly admissible under the first part of the *Martinez* analysis. Her discussion of the accident scenarios provided a helpful basis for the jury to understand her opinion that a subdural hematoma could only be caused by massive and violent force. Thus, because the expert testimony assisted the jury in determining a fact at issue in this case, it was admissible under C.R.E. 702.

■ For purposes of C.R.E. 403, however, we find it troubling that Dr. Rosquist did briefly infer for the jury that these violent accident scenarios represented the minimum force required to cause a subdural hematoma. Given her prior testimony that she could not know the minimum force required to cause such an injury, under *Martinez* it was impermissible for her to state: "I can't tell you exactly in a number how much force [it takes]. Rather what we have to do is infer from the witnessed accidental injuries." Accordingly, it was error for the district court to permit this testimony.

■ Applying a plain error standard of review, however, as we must in this case, we do not conclude that the court's error mandates reversal. Any improper inference made by Dr. Rosquist was mitigated by her affirmative testimony that she did not know what *minimum* force was required to cause the injury. Before the inference, she told the jury that no studies had been performed to discover the required force. After the inference, she ended her response to the prosecution's question of how much force it takes to cause the injury by firmly stating "I cannot tell you how much force that is."

Because Dr. Rosquist never purported to know what minimum force would be required to cause a subdural hematoma, and because the testimony was properly qualified by other statements of the same expert, we cannot say that a single improper inference rendered Dunaway's trial fundamentally unfair. Similarly, we do not conclude that the prosecution took improper advantage of this testimony. Apart from one questionable statement in its opening (referring to evidence showing the "force it takes to make a baby's brain bleed"), the prosecution made no suggestion that Dunaway's "violent action" was equivalent in force to Dr. Rosquist's accident scenarios. Accordingly, we conclude that any error on the part of the district court did not rise to the level of plain error.

## V. Conclusion

Because we determine, consistent with *Griffin*, that the prosecution need not have proven each factual alternative of the seminal elements of the crime beyond a reasonable doubt, we find no error in the trial on that basis. Additionally, we conclude that the trial court's decision to admit Dr. Rosquist's expert testimony on the force associated with subdural hematoma did not constitute plain error. Therefore, we reverse the court of appeals' opinion in this case and remand the case for reinstatement of Dunaway's conviction.

Chief Justice MULLARKEY dissents to Part III.A., and concurs in the remainder of the Opinion and in the judgment, and Justice RICE joins in the concurrence and dissent.

Justice BENDER concurs in Part III.A., dissents to Part III.B, and dissents in the judgment, and Justice MARTINEZ joins in the concurrence and dissent.

Chief Justice MULLARKEY, dissents to Part III.A., and concurs in the remainder of the Opinion and to the judgment:

I too would reverse the court of appeals' reversal of Dunaway's conviction, and I agree

that *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), overrules *James v. People*, 727 P.2d 850 (Colo. 1986). I write separately to explain that, unlike the majority, I would reverse the court of appeals' decision on the basis that the prosecution presented evidence sufficient to prove both theories of liability for the crime of child abuse beyond a reasonable doubt. Therefore, I dissent with respect to part III.A. of the majority opinion regarding sufficiency of the evidence. The majority suggests that, without evidence that Dunaway's attempt to delay the baby's treatment aggravated the injury he caused, the evidence was insufficient to prove that he permitted the child to be unreasonably placed in a situation posing a threat of serious bodily injury.

I disagree. Causing injury to a child necessarily endangers that child. In my view, where the defendant causes the injury, it is appropriate for a jury to consider the defendant's entire course of conduct with the child to determine liability for endangerment. Moreover, this issue has already been considered and decided by this court in *People v. Noble*, 635 P.2d 203 (Colo.1981), and *People v. Taggart*, 621 P.2d 1375 (Colo.1981). Both cases approved the use of a general verdict in a child abuse case presenting the two alternative theories of liability that are involved in the *Dunaway* case. Although the child abuse statute, section 18–6–401, 6 C.R.S. (2003), has changed since *Noble* and *Taggart*, the changes do not compel us to reach a different result.[1]

Section 18–6–401 recognizes that child abuse can result from action or inaction. This recognition reflects the fact that children are not only vulnerable to abuse resulting from injury or cruel punishment, but also can be injured by neglect because they are entirely dependent on adults for their health and well-being. Consequently, this court has recognized that failure to supervise a child in a potentially harmful situation may rise to the level of child abuse. *See People v. Hoehl,*

---

**1.** The statute in effect at the time Dunaway was charged was section 18–6–401, 6 C.R.S. (1998). Although the statute has since been amended, the subsections of the statute considered in this case have remained unchanged. Therefore, for convenience, I refer to the current version of the statute, section 18–6–401, 6 C.R.S. (2003).

193 Colo. 557, 560, 568 P.2d 484, 486 (1977) (Defendant who told child to warm her hands on a radiator without supervision, resulting in third degree burns to the child's hands, convicted of child abuse because there was a "reasonable probability" that the child's life or health would be endangered from the situation in which the child was placed.).

Similarly, the failure to seek appropriate medical care for a child can rise to the level of child abuse. *See Lybarger v. People,* 807 P.2d 570 (Colo.1991); *People v. Dist. Court,* 803 P.2d 193 (Colo.1990). In *Lybarger* and *District Court,* although the initial harm or danger was beyond the defendants' control, both defendants were convicted of child abuse. In *Lybarger,* the defendant did not cause his child's pneumonia, but failed to obtain medical treatment for his daughter, resulting in the child's death. 807 P.2d at 572–73. In *District Court,* the defendant did not begin caring for the child until after he had been injured. 803 P.2d at 194–95. She then took control of the child's care and failed to seek appropriate medical treatment, resulting in the child's death. *Id.* In these cases, although the defendants did not cause the initial harm, their subsequent inaction greatly exacerbated the harm.

In many child abuse cases, however, the defendant is alleged to have both inflicted physical injuries on a child *and* to have placed the child in a dangerous situation. This court addressed these types of cases in *Taggart* and *Noble.* In *Taggart,* the defendant beat a four year old child to death with a thermos jug. 621 P.2d at 1379. In upholding the general verdict, stating alternative bases of liability for injury and endangerment, we built upon *Hoehl's* construction of endangerment as a form of child abuse. *Id.* at 1383. We noted the "overriding legislative intent of prohibiting conduct that exceeds the bounds of reasonable and appropriate parental or custodial discipline ... and that creates a probable endangerment to the child's life or health." *Id.* We also rejected defendant's argument that he was deprived of a unanimous jury verdict. *Id.* at 1387. We recognized that jury unanimity is required only with respect to the ultimate issue of the defendant's guilt or innocence, not with re-

spect to the alternative means by which the crime was committed. *Id.* at 1387 n. 5. This analysis is consistent with the majority's application of *Griffin.*

In *Noble,* evidence that the defendant had severely beaten a child, causing her death, was similarly deemed sufficient to convict him of child abuse on the alternative bases of causing injury and permitting endangerment. 635 P.2d at 211. This court recognized that in the context of child abuse, these alternative forms of culpability are "not ... so discrete and independent that, as a practical matter, a verdict of guilty to one alternative could be interpreted as exclusive of the other." *Id.* We stated the principle most clearly in *People v. Schwartz,* 678 P.2d 1000, 1007 (Colo.1984): "If injury or death does result from the alleged child abuse, the victim must necessarily have been placed in a situation that 'endangered' the child's life or health...."

In 1985, after *Noble* and *Taggart* were decided, the legislature made major revisions to section 18–6–401 in order to accomplish four goals: 1) to enhance the penalties for child abuse, 2) to simplify the statute, 3) to avoid any potential equal protection problems with the statute, and 4) to more clearly define child abuse. Ch. 154, sec. 1, § 18–6–401, 1985 Colo. Sess. Laws 672–73; Hearings on S.B. 42 Before the Senate Jud. Comm., 55th Gen. Assembly, 1st Reg. Sess. (Apr. 8, 1985) (statement of Sen. Ezzard). However, there is no indication that the legislature intended to overrule *Noble* or *Taggart,* either explicitly or by necessary implication. Indeed, the changes made by the legislature are consistent with *Noble* and *Taggart* because those cases addressed the result to the child, rather than the methodology of the abuse. Before it was amended, the statute differentiated between situations that "endanger" a child's life or health and situations that "may endanger" the child's life or health. Ch. 154, sec. 1, § 18–6–401, 1985 Colo. Sess. Laws 672–73. The legislature removed this distinction, intending to change the focus of the statute to a more result oriented scheme, looking first at whether the conduct fits the definition of child abuse, and second at the defendant's mental state. Hearings on S.B.

42 Before the Senate Jud. Comm., 55th Gen. Assembly, 1st Reg. Sess. (Apr. 8, 1985) (statement of Ray Slaughter, Colorado Dist. Attorneys' Council).

In upholding the general verdict, neither *Taggart* nor *Noble* found delay in reporting or any other aggravating factor, further endangering the child's life or health, as the basis of its holding. Therefore, as applied to this case, *Noble* and *Taggart* lead to the conclusion that evidence regarding Dunaway's shaking of the child and subsequent behavior was sufficient to prove both that he caused serious bodily injury to the child, and that he concomitantly permitted the child to be unreasonably placed in a situation which posed a threat of serious bodily injury.

The majority's approach, requiring the prosecution to prove that the delay in treatment caused additional serious bodily injury, makes sense if there are two actors, as there were in *District Court*, where the second actor had nothing to do with the initial injury. This analysis would be similarly appropriate where the initial harm was otherwise outside of the defendant's control, such as the child's pneumonia presented in *Lybarger.* In a case such as Dunaway's where there is only one actor who harmed the child, the prosecution need not prove the defendant's attempted cover up in and of itself caused additional serious bodily injury. The same evidence can, and in this case does, prove that the defendant seriously injured and endangered the child. For these reasons, I dissent as to part III.A. of the majority opinion.

Justice RICE joins in this concurrence and dissent.

Justice BENDER, concurring in Part III.A.,[1] but dissenting to Part III.B., and dissenting in the judgment:

The majority rejects eighteen years of Colorado precedent by declaring that it does not offend constitutional principles of due process of law to submit an alternative theory of culpability for a charged crime that is not

supported by sufficient evidence to find guilt beyond a reasonable doubt. The majority adopts the rationale of *Griffin v. United States,* 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), despite that decision's flawed rationale and despite ample Colorado authority to the contrary set forth in *James v. People,* 727 P.2d 850 (Colo.1986), and post-*Griffin* Colorado appellate cases following *James.*

A conviction should never be based on a factually inadequate theory of culpability. To hold otherwise dilutes the bedrock constitutional principle of proof beyond a reasonable doubt, which is guaranteed by the due process clause of our state constitution. Because the course taken by the majority today violates the guarantees and protections of our state constitution, I respectfully dissent.

In *James* we held, "When a verdict of guilty is returned on a general verdict form, the lack of sufficient evidence to support a guilty verdict based on one alternative requires that the entire verdict be set aside." 727 P.2d at 855. To reach this holding, we cited the long-settled rule that when alternative theories of culpability are submitted to a jury, the unconstitutionality of any theory requires the conviction to be set aside. *Id.* at 853 (relying on *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)). Thus, we concluded that it is unconstitutional to submit a theory of culpability to a jury that is not supported by "sufficient evidence to enable the jury to find [guilt] beyond a reasonable doubt." *Id.* Because the due process clause of our constitution, like that of the federal constitution, mandates that each element of a criminal charge must be proven by proof beyond a reasonable doubt, when an alternative theory of guilt is not supported by sufficient evidence, "there can be no assurance that [a] general verdict is based upon that constitutional standard mandated by the due process clauses of both the federal and state constitutions." *Id.; see also People v. Gonzales,* 666 P.2d 123, 127 (Colo.1983); *People ex rel. Juhan v. District*

---

1. I specifically concur in Part III.A. of the majority opinion, which holds that in this case the evidence was insufficient to prove the necessary causal connection between the delay in obtaining treatment and the injury to the child.

*Court,* 165 Colo. 253, 257, 439 P.2d 741, 744 (1968).

This concern cannot be dismissed lightly. The reasonable doubt standard constitutes a cornerstone of our criminal jurisprudence because it protects our most fundamental concepts of justice. The reasonable doubt standard is "indispensable to command the respect and confidence of the community in applications of the criminal law." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). It gives "concrete substance to the presumption of innocence" by reducing the risk of convictions based on factual error. *Jackson v. Virginia,* 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (internal quotation marks omitted). And, as Justice Harlan famously observed in his concurrence in *In re Winship,* the reasonable doubt standard embodies "a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." 397 U.S. at 372, 90 S.Ct. 1068.

Even before the United States Supreme Court recognized that the reasonable doubt standard is guaranteed by the due process clause of the federal constitution, we held that proof beyond a reasonable doubt is "a principle of justice so rooted in the traditions and conscience of our people as to be ranked fundamental," and thus guaranteed by the due process clause of our state constitution. *People ex rel. Juhan,* 165 Colo. at 262, 439 P.2d at 746 (internal quotation marks omitted). We have since reaffirmed that principle in *James* and other cases, which recognize that the reasonable doubt standard cannot be satisfied where a jury is instructed on a theory that is not supported by the evidence and returns a general verdict of guilt. *See, e.g., People v. Rodriguez,* 914 P.2d 230, 273 (Colo.1996) ("[B]ecause the jury returned only a general verdict, the prosecution must have proved *each* alternative beyond a reasonable doubt.") (emphasis in original); *People v. Hall,* 60 P.3d 728, 734 (Colo.App.2002) (analyzing the meaning of due process under Colorado law); *People v. Hansen,* 972 P.2d 283, 285 (Colo.App.1998); *People v. Hanson,* 928 P.2d 776, 780 (Colo. App.1996).

Despite our long-established understanding of the meaning of due process under our state constitution and our recognition that the reasonable doubt standard is a fundamental constitutional guarantee, the majority adopts the reasoning and rule of *Griffin* solely because *James* rests in part on federal due process grounds. *See* maj. op. at p. 630. In *Griffin,* the defendant was charged with multiple-object conspiracy. The facts established that she conspired to impair the efforts of the IRS to ascertain income taxes but not to impair the efforts of the DEA to identify forfeitable assets. Nonetheless, the jury was instructed that it could find the defendant guilty if it found the defendant had participated in either object of the conspiracy, and the jury returned a general verdict of guilt.

The Court upheld the verdict and dismissed the argument that a jury instruction that includes a factually inadequate theory of culpability violates due process. The Court reviewed a line of cases that applied the rule of *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), and found them all distinguishable from the facts of *Griffin.* The defendant in *Stromberg* was accused of violating a California statute that prohibited the display of a red flag as a symbol of opposition to organized government, an invitation to anarchistic action, or an aid to seditious propaganda. *Stromberg,* 283 U.S. at 361, 51 S.Ct. 532. The Court held that a general verdict finding the defendant guilty of violating the statute must be overturned because the first ground of conviction was unconstitutional, and a general verdict did not allow a reviewing Court to determine the ground upon which the verdict was decided. *Id.* at 368, 51 S.Ct. 532.

This rule was applied in *Yates v. United States,* 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), to set aside a general verdict where the jury was instructed on alternative theories of liability, one of which was barred by the statute of limitations. *See id.* at 312, 77 S.Ct. 1064. The *Yates* Court applied *Stromberg* and held that in circumstances "where the verdict is supportable on one ground, but not another, and it is impossible to tell which ground the jury selected," the verdict must be set aside. *Id.*

The Court distinguished these cases from *Griffin*, on the ground that "one of the possible bases of conviction [in *Griffin*] was neither unconstitutional, as in *Stromberg*, nor even illegal as in *Yates*, but merely unsupported by sufficient evidence." *Griffin*, 502 U.S. at 56, 112 S.Ct. 466. Where a possible basis of a conviction is "merely unsupported by sufficient evidence," the Court concluded that a jury can be trusted to assess the evidence correctly and apply it appropriately. *See id.* at 59, 112 S.Ct. 466. If that means tolerating some risk that a conviction will be based on something less than proof beyond a reasonable doubt, the Court found that risk "remote" and tolerable. *See id.*

In my view, the Court's analysis entirely misses the mark. The distinction drawn in *Griffin* between an instruction that allows a jury to convict on a ground not supported by sufficient evidence and one that allows a jury to convict on an unconstitutional ground is illusory. *See Griffin*, 502 U.S. at 56, 112 S.Ct. 466. An instruction that allows a jury to convict on a ground not supported by sufficient evidence is itself unconstitutional, as we made clear in *James*, because it violates the requirement of the due process clause that a conviction must be based on proof beyond a reasonable doubt.

When evaluating the validity of a general verdict of guilt, our concern should be whether the verdict adheres to this standard, not whether there is a "remote" chance that the jury applied the evidence to the wrong theory of culpability. From that point of view, any general verdict that might rest on a factually inadequate basis is constitutionally infirm because it violates the requirements of due process. *See James*, 727 P.2d at 853; *see also Jackson v. Virginia*, 443 U.S. at 316, 99 S.Ct. 2781 (judgments not supported by proof beyond a reasonable doubt are invalid as a matter of law and must be set aside under the Due Process Clause of the Fourteenth Amendment).

*Griffin* contravenes this principle and thus should not be adopted by this Court. As the majority recognizes, we are free to interpret our state constitution in a manner that deviates from the United States Supreme Court's interpretation of the federal constitution. *See* maj. op. at p. 630 (citing *People v. Dist.*

*Court*, 834 P.2d 181, 193 (Colo.1992); *see also People ex rel. Juhan*, 165 Colo. at 260–61, 439 P.2d at 745 ("There is not the slightest requirement that the meaning of 'due process of law' shall be the same in each of the fifty states."). The meaning of due process under our state constitution is clear. Both before and after *James*, all criminal convictions must be based on proof beyond a reasonable doubt. *See People ex rel. Juhan*, 165 Colo. 253, 439 P.2d 741, 746 (1968); *People v. Rodriguez*, 914 P.2d 230 (Colo.1996); *People v. Hall*, 60 P.3d 728 (Colo.App.2002); *People v. Hansen*, 972 P.2d 283, 285 (Colo.App. 1998); *People v. Hanson*, 928 P.2d 776, 780 (Colo.App.1996). *Griffin* is contrary to our long-established understanding of due process of law and undermines the principle that criminal convictions must be based on proof beyond a reasonable doubt. Thus, we should now depart from the federal rule and adhere to our own precedent.

In this case, the jury was instructed that the defendant could have committed child abuse by "caus[ing] an injury to a child, *or* ... permit[ting] a child to be unreasonably placed in a situation which posed a threat of injury to a child's life or health" (emphasis added). Because in this case the jury returned a general verdict of guilt, the defendant *may* have been convicted of committing child abuse by permitting "a child to be unreasonably placed in a situation which posed a threat of injury to a child's life or health." As the majority explains, the evidence in this case was insufficient to support a conviction for child abuse on this ground, which means that the defendant may have been convicted of a charge that was not proven beyond a reasonable doubt. *See* maj. op. at 627.

Such a result should not be tolerated under our state constitution. I would therefore affirm the court of appeals in this case and leave our analysis of the due process clause of the Colorado Constitution undisturbed.

I am authorized to state that Justice MARTINEZ joins in this concurrence and dissent.