23CA1866 Peo v McNeal 09-18-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1866
City and County of Denver District Court No. 22CR6017
Honorable Karen L. Brody, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Treneil M. McNeal,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE SCHUTZ
Fox and Harris, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 18, 2025

---

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver, Colorado, for Plaintiff-Appellee

Robert W. Kiesnowski, Jr., Alternate Defense Counsel, Commerce City, Colorado, for Defendant-Appellant

¶ 1     This case arises from the shooting of Gregory Hopkins by Javon Price.  For supplying the gun Price used to shoot Hopkins, defendant, Treneil M. McNeal, was charged with first degree murder on a conspiracy theory.  At trial, McNeal's defense was that Price had shot and killed Hopkins and that he did not supply the gun.  The jury convicted McNeal of the lesser included offense of second degree murder, and the court sentenced him to forty years in the custody of the Department of Corrections.

¶ 2     McNeal now appeals.  We affirm the judgment of conviction.

## I.     Factual and Procedural Background

¶ 3     Price worked at a concession stand in Coors Field, along with Madison Rickey and Rayvell Powell.  Hopkins managed the stand.  The four of them were working the evening of August 6, 2021, when an argument erupted between Price and Hopkins.  After the argument, Price left in the middle of his shift and Hopkins stayed until closing.

¶ 4     At the end of the night, Hopkins started to walk out with a coworker then abruptly veered towards a different exit.  Shortly after Hopkins left his coworker, he exited Coors Field and, as video surveillance showed, was confronted by three men.  Several shots

1

rang out. Emergency responders found Hopkins unresponsive at the bottom of a staircase with at least four bullet wounds.

¶ 5 Two of Hopkins's coworkers, including the one he had almost walked out of the stadium with, identified Price, Powell, and Hopkins as three of the men in the video; the fourth remained unidentified for almost a year. Eventually, due to an investigative lead in another case, McNeal was identified as the fourth man in the video and charged with first degree murder.

¶ 6 Before trial, McNeal moved to suppress all evidence police obtained through a search warrant directed at his cell phone. McNeal argued that the search warrant lacked particularity and therefore violated his Fourth Amendment rights. The court denied McNeal's motion, finding the warrant was not overbroad.

¶ 7 Shortly before trial began, the prosecution sought to introduce evidence of McNeal's involvement in a later, unrelated shooting at Zeppelin Station, as well as location data derived from the GPS ankle monitor he wore on the night Hopkins was shot. The trial court granted the prosecution's motion in part and denied it in part. The court reasoned that the prosecution could introduce evidence that McNeal was wearing an ankle monitor at the time Hopkins was

shot and the "locational data transmitted from the monitoring." But the court barred the prosecution from introducing evidence related to the Zeppelin Station shooting. The court did, however, permit the prosecution to elicit a narrow statement explaining the delay in identifying McNeal as a suspect.

¶ 8 During jury selection, McNeal made a *Batson* challenge to the prosecution's peremptory strike of a prospective juror. The court denied the challenge, ruling that the prosecution articulated a race-neutral reason for excluding the juror and that the reason was not a pretext for purposeful discrimination.

¶ 9 As the trial progressed, the prosecution planned to call Rickey. Outside the presence of the jury, the prosecution raised two potential hearsay issues that might arise during McNeal's cross-examination of Rickey. The court ultimately decided that McNeal could not cross-examine Rickey on two specific statements because they called for hearsay responses. In the first statement, Rickey told a police officer that, before the shooting, Powell had asked Rickey to store a gun in her car. In the second statement, Rickey told a different police officer that she had called Hopkins on the night of the homicide to warn him that Price and Powell had a gun.

3

The court sustained the prosecution's objections to any questions referencing those statements.

¶ 10     Later, the prosecution called Javon Price as a witness, despite multiple warnings from both Price's counsel and McNeal's counsel that Price would refuse to testify if called as a witness even if offered immunity. As forecasted, Price invoked his Fifth Amendment rights when asked his name. At that point, the prosecution conceded that Price would not answer any questions, and the court dismissed him from the witness stand.

¶ 11     Near the end of trial, the prosecution sought to introduce GPS location records that were collected by McNeal's ankle monitor. McNeal objected to the records on the grounds that they were hearsay. The prosecution countered that the records were admissible under CRE 803(6). The court overruled McNeal's objections.

¶ 12     McNeal now appeals his conviction, challenging the legal and evidentiary issues noted above.

## II. Analysis

### A. Cell Phone Search Warrant

¶ 13    McNeal argues that the trial court erred in denying his motion to suppress his cell phone records on the grounds that the scope of the search authorized by the warrant was overbroad. We disagree.

#### 1. Additional Facts

¶ 14    The trial court made the following factual findings based on the investigating officer's affidavit in support of the warrant.

¶ 15    In May 2022, more than nine months after the Coors Field shooting, police responded to a shooting that occurred at Zeppelin Station and began an investigation. Police eventually matched the bullet casings from the Zeppelin Station shooting with the casings found at the Coors Field shooting. This allowed them to identify McNeal as the unknown fourth man in the video footage.

¶ 16    Using the GPS data from McNeal's ankle monitor, police confirmed that he was at Coors Field the night that Hopkins was shot and left shortly after the shooting. Based on the matching ballistics, the GPS data from the ankle monitor, and the physical similarities between McNeal and the unidentified man in the video, police obtained a warrant to search McNeal's phone.

¶ 17    Police had requested the warrant to allow them to search for information relevant to both the Coors Field and the Zeppelin Station investigations. The resulting warrant incorporated the affidavit. The warrant encompassed all of McNeal's call and text messaging records for a fourteen-month period.

### 2.    Standard of Review

¶ 18    "In reviewing a suppression order, we defer to the trial court's findings of fact if they are supported by the record and review its legal conclusions de novo, taking into consideration the totality of the circumstances, to determine whether the suppression order should be upheld or set aside." *People v. Davis*, 187 P.3d 562, 563-64 (Colo. 2008). If we determine the trial court erred by failing to suppress evidence, the error is reversible unless it was harmless "beyond a reasonable doubt." *Niemeyer v. People,* 2024 CO 58, ¶ 50 (quoting *Hagos v. People,* 2012 CO 63, ¶ 11).

### 3.    Applicable Law

¶ 19    The Fourth Amendment protects individuals from an unreasonable search or seizure of personal property by the government. U.S. Const. amend. IV. A warrant may be issued only if there is probable cause for a search or seizure. *Id.*

¶ 20   A "general warrant" is one that permits "general, exploratory rummaging in a person's belongings." *People v. Coke*, 2020 CO 28, ¶ 34 (quoting *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)). General warrants are prohibited under the Fourth Amendment. *Id.* Thus, a warrant must be supported by probable cause that a crime has been committed, and the scope of the warrant must be "sufficiently particular that it enables the executing officer to reasonably ascertain and identify the things authorized to be seized." *People v. Rodriguez-Ortiz*, 2025 COA 61, ¶ 22 (quoting *People v. Roccaforte*, 919 P.2d 799, 803 (Colo. 1996)). A warrant lacks particularity if it does not describe with specificity the place or thing to be searched and the information to be seized. *United States v. Suggs*, 998 F.3d 1125, 1132 (10th Cir. 2021).

¶ 21   When evaluating whether a warrant is sufficiently particular, the reviewing court must look at the "totality of the circumstances," *Rodriguez-Ortiz*, ¶ 21, reviewing the warrant and any "accompanying affidavits" in a "practical, common sense fashion" to determine if probable cause exists. *Id.* at ¶ 23 (quoting *Roccaforte*, 919 P.2d at 804).

¶ 22 Because cell phones contain so many different types of private data, warrants to search them must be carefully scrutinized. *See Coke*, ¶ 37 ("Given modern cell phones' immense storage capacities and ability to collect and store many distinct types of data in one place, this court has recognized that cell phones 'hold for many Americans the privacies of life' and are, therefore, entitled to special protections from searches." (quoting *People v. Davis*, 2019 CO 24, ¶¶ 17-22)). In *Coke*, the warrant was not restricted to evidence related to the particular crime being investigated and did not limit the search to the time period when the alleged assault happened. *Id.* at ¶ 38. Therefore, the supreme court held it was "unreasonable under the Fourth Amendment." *Id.*

### 4. Cell Phone Warrant Analysis

¶ 23 McNeal argues the warrant violated the Fourth Amendment because it was not sufficiently particular in terms of the dates to be searched and the information to be gathered.

¶ 24 The trial court wrote a thorough order explaining its findings and discussing the legal authorities justifying its conclusion that the warrant was sufficiently particular. The trial court determined that the police requested a warrant that encompassed fourteen

months of McNeal's cell phone data because the warrant covered McNeal's potential involvement in both the Coors Field shooting and the Zeppelin Station shooting. The trial court also noted that the officer's supporting affidavit was incorporated into the warrant by reference. This was critical because the affidavit — in bold letters — specified that "[t]hese records will be searched by the Denver Police Department and/or the Denver District Attorney's Office for evidence pertaining to the Homicide – Shooting that occurred on August 6th, 2021 [the date Hopkins was murdered], and the Aggravated Assault – Shooting that occurred on May 4th, 2022 [the day of the Zeppelin Station shooting]." *See United States v. Bishop*, 910 F.3d 335, 337 (7th Cir. 2018) (The particularity requirement is met if "the warrant cabins the things being looked for by stating what crime is under investigation."); *see also People v. Noble*, 635 P.2d 203, 209 (Colo. 1981) (the particularity requirement eliminates the "likelihood of confusion or uncertainty by the executing officers as to the scope of the permissible search").

¶ 25    The court reasoned that when reading the warrant and supporting affidavit together in a practical and commonsense

9

manner, *see Roccaforte*, 919 P.2d at 804, the warrant was sufficiently particular and therefore not a general warrant.

¶ 26    On appeal, McNeal again relies on *Coke* to suggest that the warrant lacked particularity.  But we find *Coke* distinguishable.  That case involved a warrant that allowed police to "search all texts, videos, pictures, contact lists, phone records, and any data that showed ownership or possession."  *Coke*, ¶ 38.  It also allowed law enforcement to search for and seize "any . . . fruits or proceeds of a crime, or data intended to be used in the commission of a crime."  *Id.* at ¶ 35.  The warrant in this case specified what was to be searched (only McNeal's phone records), and what kind of information could be seized.  The information in question included device and account information identifying who the phone belonged to, as well as call information, messaging information, and location data from the phone — but only during the fourteen-month period that included the Coors Field shooting and the Zeppelin Station shooting.  Moreover, by incorporating the probable cause affidavit, the warrant was restricted to evidence pertaining to the Hopkins homicide and the Zeppelin Station shooting.

¶ 27    Given these limitations, we conclude that the warrant was sufficiently particular.  Therefore, the trial court did not err by denying the motion to suppress.

### B.    *Batson* Challenge to Prospective Juror DD

¶ 28    McNeal argues that the trial court erred by denying his *Batson* challenge to the prosecution's peremptory strike of presumptive juror DD,[1] who, like McNeal, is Black.  We disagree.

### 1.    Standard of Review

¶ 29    During the jury selection process, a party may not discriminate based on a prospective juror's race or ethnicity.  *See* U.S. Const. amend. XIV; Colo. Const. art. II, §§ 16, 25; *see also Batson v. Kentucky*, 476 U.S. 79, 85-87 (1986).  If a party raises a *Batson* challenge alleging racial discrimination, the trial court engages in a three-step analysis.  *People v. Toro-Ospina*, 2023 COA 45, ¶ 16.  First, the court must determine if the objecting party made a prima facie showing that the peremptory strike was based on race; second, if the first step is met, the striking party must offer

---

[1] A presumptive juror is a person seated in the jury box during voir dire, who, unless struck by a party or removed by the court, would be sworn in as a juror at the end of voir dire.

a race-neutral reason for the removal of the prospective juror; and third, the court must determine whether the objecting party has shown by a preponderance of evidence that the strike was purposefully discriminatory on the basis of race. *Id.*; *see People v. Ojeda*, 2022 CO 7, ¶¶ 21-27. The third step in a *Batson* challenge is a question of fact, so we review the trial court's decision for clear error. *People v. Phillips*, 2012 COA 176, ¶ 161. Under clear error review, we must affirm the district court's finding unless it is without record support. *Martinez v. People*, 2024 CO 6M, ¶ 34.

### 2. *Batson* Analysis

¶ 30 McNeal does not challenge the first or second *Batson* steps. Thus, we are only reviewing to assess whether the trial court erred by finding that McNeal did not satisfy his burden of proving that the prosecutor's striking of DD was "motivated in substantial part by discriminatory intent." *Flowers v. Mississippi*, 588 U.S. 284, 303 (2019) (quoting *Foster v. Chatman*, 578 U.S. 488, 513 (2016)).

¶ 31 Before the start of jury selection, all the prospective jurors completed questionnaires. DD left a question about his prior criminal history blank, so the prosecution ran a search to determine if DD had any previous criminal convictions. The

12

prosecution reported that he did.  After hearing this information, the court and counsel spoke with DD at the bench.

> THE COURT: Okay.  Mr. DD, thank you so much.  Just want to doublecheck on something.  When we asked the question about whether or not you had been a party or a witness or involved in any court proceeding, it — we have a concern just because the name was a little bit familiar.  Do you have any kind of criminal history?  Have [y]ou been a defendant in a criminal case?
>
> PROSPECTIVE JUROR: Have I been — yes.
>
> THE COURT: Okay. What — and so what — yeah.  That's — maybe the question wasn't clear.  Can you give us more insight into that[?]  I think it's something we need to know, since that's what the question was really aimed at, whether or not you've been a party in a criminal case.
>
> PROSPECTIVE JUROR: Yes.  I was part of a criminal case, and it got found guilty.
>
> THE COURT: Okay.  What was that?
>
> PROSPECTIVE JUROR: It was a — for assault.
>
> . . . .
>
> THE COURT: Okay.  And is that the only case?
>
> PROSPECTIVE JUROR: Yes.
>
> THE COURT: Counsel, do you have any follow-up questions?

13

PROSECUTION: I mean, it looks like there was one from 2022, one from 2016, one from 2013 and one from 2006. Does that sound accurate? And 2018 as well.

. . . .

DEFENSE COUNSEL: I think the ultimate question, sir is: Do you think you could be fair both to the Defense and to the Prosecution?

PROSPECTIVE JUROR: I could be. I don't have no problem with neither side as far as going with what the judge asked us to do.

THE COURT: Okay. So there's nothing about. I know there was a — and I appreciate your explanation of the circumstances, but I want to make sure. Is the fact that — you've been in the system and you know a little bit about what goes on. Is that going to cause you to be — you know, to give the Defense a leg up?

PROSPECTIVE JUROR: No. I wouldn't do that, because I don't think it was done for me . . . .

¶ 32    The prosecutor later used a peremptory challenge seeking to excuse DD. McNeal's counsel objected on the grounds that DD was the only presumptive juror of the same race as McNeal. The prosecutor responded that the decision to strike DD was based on the fact that he failed to answer the criminal history inquiry on the questionnaire; had five prior felony charges, at least one of which resulted in a conviction; and failed to take accountability for his

14

criminal record. The trial court found the prosecutor's explanation was race-neutral, credible, and that there was no indication that the strike was racially motivated. The court also noted that DD was evasive in his answers to the questions posed by counsel and the court regarding his past criminal history. Considering these factors, the court denied the *Batson* challenge.

¶ 33 Given DD's lack of candor in completing his jury questionnaire, his significant past interactions with the criminal justice system, and his responses to counsel's and the court's questions, we discern no error in the trial court's conclusion that McNeal failed to prove that the peremptory challenge was motivated, in substantial part, by racial prejudice. *See Flowers*, 588 U.S. at 303.

## C. Prosecutorial Misconduct

¶ 34 During the prosecution's opening statement, McNeal objected to a remark regarding how McNeal became a suspect in the case. Specifically, McNeal argued that the language the prosecution used strayed too far from the language the court allowed. The court overruled McNeal's objection at trial.

¶ 35    On appeal, McNeal now argues that the prosecutor committed misconduct, and that the court erred in overruling McNeal's objection.

### 1.    Preservation and Standard of Review

¶ 36    To preserve an issue for appeal, the objecting party must bring the issue "to the attention of the trial court [so] that the court [is] given an opportunity to rule on it."  *Dill v. Rembrandt Grp., Inc.*, 2020 COA 69, ¶ 24 (quoting *Berra v. Springer & Steinberg, P.C.*, 251 P.3d 567, 570 (Colo. App. 2010)).

¶ 37    "We review preserved claims of prosecutorial misconduct under the nonconstitutional harmless error standard."  *People v. Walker*, 2022 COA 15, ¶ 28.  "Under the nonconstitutional harmless error test, the defendant bears the burden of showing prejudice from the error."  *People v. Short*, 2018 COA 47, ¶ 54.  And to "obtain reversal, the defendant must establish a reasonable probability that the court's error contributed to his conviction," meaning that there must be a "probability sufficient to undermine confidence in the outcome of the case."  *Id.* (quoting *People v. Casias*, 2012 COA 117, ¶¶ 62-63).

## 2. Opening Statement Analysis

¶ 38    The People argue that McNeal failed to preserve his objection because counsel did not specifically argue that the statement constituted prosecutorial misconduct.  We disagree.

¶ 39    Recall that the court had drafted a specific statement to explain the delay in identifying McNeal as suspect.  Specifically, the court allowed the prosecution to elicit evidence that "[a] *subsequent* investigative lead obtained in May 2022 led law enforcement to identify Mr. McNeal as a suspect in this case."  (Emphasis added.)

¶ 40    During opening statements, however, the prosecution stated: "Over a year later, police are able to[,] through a *separate* investigation[,] identify the name Treneil McNeal as the third suspect in this case."  (Emphasis added.)  McNeal's counsel asked to approach the bench outside the hearing of the jury.

¶ 41    At the bench conference, defense counsel clearly stated that the statement made by the prosecutor did not accurately track the court's approved statement, having used the word "separate" rather than "subsequent."  Although McNeal's counsel did not expressly use the phrase "prosecutorial misconduct," we conclude that this

17

was the clear substantive basis for the objection, such that the trial court was alerted to the contention. *Berra*, 251 P.3d at 570.

¶ 42   During the bench conference, McNeal's counsel proposed two ways by which the court could address the misstatement. First, counsel proposed that he be allowed during his opening statement to say that McNeal's identity was obtained through a subsequent lead. Second, counsel suggested that the court could read the correct statement in a "jury instruction as a stipulation or something couched that way."

¶ 43   The court then stated it would permit McNeal's counsel to say that the identification of McNeal was made through a subsequent lead. The court also said that it would give a curative instruction. Thus, the court granted both remedies requested by McNeal.

¶ 44   Nonetheless, McNeal's counsel elected not to make a corrective statement during his opening. Therefore, this omission cannot form the basis of any error on appeal. Moreover, despite the court's expressed willingness to provide a stipulation or curative instruction, McNeal's counsel never tendered such a stipulation or instruction to the court. And McNeal did not object to the trial court's failure to provide a stipulation or curative instruction, so

any error associated with that omission is reviewable only for plain error.

¶ 45 During the trial, the prosecution did not introduce any testimony that referenced a subsequent investigation. To the contrary, one of its witnesses — consistent with the court's allowed statement — referred to the identification of McNeal through a "subsequent investigative lead." Nor did the prosecution argue in closing that the identification of McNeal was attributed to a separate investigation.

¶ 46 A plain error must be obvious and substantial. *See Hagos*, ¶ 14. Given defense counsel's decision not to further address the issue during his opening statement, the subsequent "correct" characterizations by the testifying officer, and defense counsel's failure to tender a stipulation or request a curative instruction, we cannot say that the failure to give the instruction was obvious or substantial. Thus, we discern no plain error.

### D. Cross-Examination of Rickey

¶ 47 McNeal next argues that the trial court abused its discretion when it did not permit his counsel to pursue two lines of

questioning concerning statements Rickey made to police officers. We disagree.

### 1. Standard of Review

¶ 48 We review a trial court's decision to admit or exclude evidence, including whether testimony calls for hearsay, for an abuse of discretion. *People v. Jackson*, 2018 COA 79, ¶ 47, *aff'd on other grounds*, 2020 CO 75. A trial court abuses its discretion when its ruling is "manifestly arbitrary, unreasonable, or unfair, or based on a misunderstanding or misapplication of the law." *People v. Heredia-Cobos*, 2017 COA 130, ¶ 6. "'Hearsay' is a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c).

### 2. Hearsay Analysis

¶ 49 During her direct examination, Rickey testified that she heard the gunshots that killed Hopkins but did not see Price or McNeal at that moment and was not with them. She also admitted on direct examination that she was untruthful in responding to investigators during her first three interviews.

¶ 50    The prosecution identified two lines of questioning that it thought McNeal might explore on cross-examination, and the court determined they both called for hearsay. As a result, the court did not permit McNeal to inquire whether:

(1)    Powell asked Rickey if she would store a gun in her car before Price shot Hopkins;

(2)    Rickey stated to Detective Sandoval that she called Hopkins and warned him that Price and Powell had a gun.

¶ 51    We address each contention in turn.

a.    Powell's Question: Storing a Gun

¶ 52    McNeal argues that he should have been allowed to question Rickey whether Powell had asked her to store a gun in her car because, he contends, the question is not hearsay. His argument that the question is not hearsay rests on the proposition that an "assertion" can never be a question. We disagree.

¶ 53    There is no rule or exception stating that a question cannot be an assertion. Colorado courts have not definitively decided whether a question can be a statement for purposes of a hearsay analysis. But a division of this court has previously discussed whether a

21

conditional sentence may qualify as hearsay. *Phillips*, ¶ 105. A

conditional sentence is one that gives a demand and lays out a

consequence if the demand is not met. *Id.* at ¶¶ 102-105. In

*Phillips*, the division determined that the statement at issue was not

a statement for the purposes of hearsay because a command or

instruction does not inherently contain a "truth" that can be

asserted. *Id.*

¶ 54     Following that logic, we assess whether the question Powell

asked Rickey contained an assertion. *Id.*; *see also People v. Vigil*,

2024 COA 72, ¶ 28 ("The rule against hearsay encompasses not

only verbatim out-of-court statements, but also implied hearsay or

testimony that raises an inference of out-of-court statements.");

*United States v. Summers*, 414 F.3d 1287, 1300 (10th Cir. 2005)

("[A] question may . . . constitute an assertion within the meaning of

[Fed. R. Evid.] 801(a) and (c)."). If the question does contain an

assertion, we must also inquire whether the assertion falls within a

hearsay exception. If the question does not contain any assertion

that is offered for the truth of what it asserts, then the question is

not hearsay and may be admitted. *See United States v. Lewis*, 902

F.2d 1176, 1179 (5th Cir. 1990) (concluding that the question,

"Where is Dog [the defendant's nickname]?" did not contain an assertion and is therefore not hearsay).

¶ 55    Unlike a conditional statement, which states a potential future action, the question, "Will you keep this gun in your car for me?" does contain an assertion — namely, that the person to whom the question is attributed has a gun.  Counsel's clear motivation for asking Rickey whether Powell had asked her to store a gun in her car was to establish that someone other than McNeal had a gun, which could have been used to kill Hopkins.  Because the assertion within the question was offered to prove its truth, the question falls within the definition of hearsay.

¶ 56    McNeal argues that the question concerning whether Powell had asked Rickey to store a gun was not offered to prove the truth of the matter asserted, but rather to show its effect on Rickey.  But Rickey's state of mind was not relevant to the issues the jury was asked to decide.  Relatedly, McNeal argues that the question was relevant to explain why Rickey was dishonest in her prior statements to law enforcement.  But Rickey had already admitted that she was dishonest in her three prior interviews, and McNeal

23

offers no explanation why her reason for being dishonest was relevant to his defense.

¶ 57 For these reasons, we perceive no error in the trial court's determination that Powell's question to Rickey was inadmissible hearsay.

### b. Phone Call to Hopkins

¶ 58 Rickey had four interviews with Detective Sandoval. She admitted that she lied to Sandoval during the first three. In her final statement to Sandoval, Rickey indicated she had called Hopkins to warn him that Price and Powell had a gun. That statement was not elicited during her direct examination.

¶ 59 McNeal's counsel stated he intended to inquire whether Rickey told Sandoval that she called Hopkins to warn him that Powell and Price had a gun. This question also contains an assertion: Powell and Price had a gun. *See Summers*, 414 F.3d at 1300. McNeal nevertheless argues that question was not hearsay because it related to her dishonesty during her first three statements to Sandoval.

¶ 60 McNeal seems to imply an impeachment purpose for eliciting Rickey's testimony — she said one thing to Sandoval and is now

24

testifying to something different. If Rickey's testimony at trial concerning the alleged phone call to Hopkins had been materially different from her interview with Sandoval, then the use of her previous statements for impeachment purposes would have arguably been permissible under CRE 801(d)(1) ("A statement is not hearsay if . . [t]he declarant testifies at the trial . . . and is subject to cross-examination concerning the statement, and the statement is . . . inconsistent with the declarant witness's testimony. . . ."). However, Rickey acknowledged at trial that she was dishonest with Sandoval in three previous interviews. And she did not testify at trial that she had *not* called Hopkins to warn him that Powell and Price had a gun. Thus, there is no support for McNeal's argument that he should have been permitted to elicit the statement for impeachment purposes.

¶ 61 Next, McNeal argues that the statement was admissible because "it was Rickey's own statement, and the [prosecution] would have had an opportunity on redirect examination to question Rickey about her making that statement." But out-of-court statements made by a testifying nonparty are generally deemed hearsay and are therefore not admissible unless they are excluded

25

from the hearsay definition, *see* CRE 801(d), or fall within a hearsay exception, *see* CRE 803(1)-(23); CRE 804(b)(1)-(4); CRE 807. McNeal cites no authority that would support a conclusion that Ricky's out-of-court statement to Sandoval concerning her phone call to Hopkins falls outside the definition of hearsay or within a hearsay exception. We therefore decline to address it further.

¶ 62 For these reasons, we conclude that the trial court did not err by ruling that Rickey's prior statement to Sandoval was inadmissible hearsay. It necessarily follows that Rickey's argument that the trial court's ruling deprived him of his constitutional right to a defense also fails. *See People v. Conyac*, 2014 COA 8M, ¶ 91 (the limits of cross-examination are matters within the trial court's sound discretion, and absent an abuse of that discretion we will not disturb the trial court's ruling).

E. Calling Price to Testify

¶ 63 McNeal next argues that the trial court erred when it permitted the prosecution to call Price as a witness, knowing he would exercise his Fifth Amendment right to remain silent. We agree that the court erred but determine that the error was harmless.

26

### 1. Preservation and Waiver

¶ 64    The People argue that McNeal did not object to Price being called as a witness despite knowing he would invoke his Fifth Amendment right to remain silent and therefore did not preserve the issue.  Moreover, the People argue that McNeal waived the claim because he "agreed with the procedures that the trial court followed" before Price was called to the witness stand.

¶ 65    Waiver is the "intentional relinquishment or abandonment of a known right" and occurs "when a defendant specifically removes claims from the trial court's consideration."  *McGill v. DIA Airport Parking, LLC*, 2016 COA 165, ¶ 12 (first quoting *U.S. v. Olano*, 507 U.S. 725, 733 (1993); and then quoting *People v. Rediger*, 2018 CO 32, ¶ 54).

¶ 66    We disagree with the People's argument that McNeal waived this contention.  Before Price's testimony, McNeal's counsel objected to him being called to the stand because it was clear Price would invoke his right to remain silent.  The court overruled that objection.

¶ 67    As the People note, when the court and counsel discussed how the court would advise Price that he was being granted use

27

immunity with respect to his testimony, McNeal's counsel agreed to some of the proposed procedures. But in doing so, he did not waive his prior objection. Indeed, when the procedures were being discussed, McNeal's counsel stated, "I feel like I have to object to preserve an issue," and "I've been objecting to this whole process the whole time." Given this clear language, we reject the People's contention that McNeal waived or failed to preserve this issue.

### 2. Standard of Review and Applicable Law

¶ 68 The parties dispute the applicable standard of review. We need not resolve the dispute because, even assuming we review for an abuse of discretion, as the People contend, we conclude that the court abused its discretion by allowing the prosecution to call Price, knowing that he intended to invoke his right to remain silent.

¶ 69 Generally, the prosecution may not call a witness to testify if it knows the witness will invoke their right to remain silent. *People v. Newton*, 940 P.2d 1065, 1067 (Colo. App. 1996) (*Newton I*), *aff'd in part*, 966 P.2d 563 (Colo. 1998) (*Newton II*), *abrogated on other grounds by*, *Nicholls v. People*, 2017 CO 71. "The rationale for the rule is that, because of the high courtroom drama and odium surrounding a claim of privilege, questioning of a witness asserting

[a Fifth Amendment protection against self-incrimination] before the jury has the effect of prejudicing the accused by creating an unfair inference of guilt." *Newton I, 940 P.2d at 1067.* Thus, "[i]f the court finds that the claim of privilege [is] invalid, it should consider contempt penalties against the witness, rather than allowing questioning that could be prejudicial to the defendant." *Id.*

¶ 70 When evaluating the harm associated with allowing the prosecution to improperly call a witness who invokes their Fifth Amendment rights before the jury, we look at the totality of the circumstances. *Newton II, 966 P.2d at 570.* There are four factors we consider: (1) the prosecution's intent in calling the witness; (2) the number of questions the prosecutor asked the witness; (3) the witness's importance to the prosecution's case; (4) whether the prosecutor draws any inference in closing argument from the witness's refusal to answer the question; and (5) whether the court gave a curative instruction. *Id.*

### 3. Analysis

¶ 71 Before Price was called to testify at trial, the court and parties addressed McNeal's objections. Initially, the court acknowledged that it is generally impermissible to call a witness to testify knowing

they will invoke their Fifth Amendment rights. But the court was also attempting to address what it believed it was required to do under the supreme court's then-recent decision in *Rios-Vargas v. People*, 2023 CO 35.

¶ 72    In *Rios-Vargas*, the supreme court addressed the circumstances in which a defendant may be permitted to call an alternative suspect to testify, knowing that they will invoke their Fifth Amendment rights. *Id.* at ¶ 4. The court concluded that the defendant should have been permitted to call the alternate suspect, and the jury should have been permitted to hear the alternate suspect invoke the Fifth Amendment, subject to the detailed procedures noted in the opinion. *Id.*

¶ 73    The trial court appeared to draw on *Rios-Vargas* in deciding to permit the prosecution to call Price to the witness stand. But *Rios-Vargas* is clearly distinguishable. It addresses the procedures that must be followed when a *defendant* elects to call an alternate suspect to testify, knowing that the witness will invoke their right to remain silent. But here it was the *prosecution* that intended to call Price. As *Rios-Vargas* makes clear, the procedure it mandates applies only when a defendant seeks to call a witness who will

invoke their Fifth Amendment rights. *See id.* at ¶ 4 ("We now hold that a defendant is entitled to question a nonparty alternate suspect in the jury's presence under the circumstances and procedures set forth in this opinion.").

¶ 74 The supreme court clearly did not intend the rules announced in *Rios-Vargas* to apply to witnesses called by the prosecution. *See id.* at ¶ 5 ("In practice, our holding today will apply in relatively narrow circumstances."). Indeed, to do so would eviscerate the prophylactic purposes of the bar prohibiting the prosecution from engaging in such practices. Thus, the trial court erred by applying the *Rios-Vargas* procedures in this case.

¶ 75 We turn now to the four *Newton II* factors to determine if the error warrants reversal.

¶ 76 The prosecution's stated intent in calling Price was to have him identify himself in the video footage from Coors Field. This explanation is thin, at best. The prosecution had already called several witnesses who worked with Price at the concession stand and identified him as one of the men in the video. Because the identification had already come from other witnesses, this was not a compelling reason for the prosecution to call Price to testify. And

doing so created the odium and "high courtroom drama" that the prohibition is intended to avoid. This factor weighs on the reversal side of the scale.

¶ 77 But once Price was at the witness stand, the prosecutor only attempted to ask him one question: his name. This favors a conclusion that the error was not reversible because the prosecutor did not ask any additional questions after Price refused to testify. The prosecutor also did not rely in closing argument on Price's invocation of his Fifth Amendment rights to draw any inferences prejudicial to McNeal. This factor also weighs against reversal.

¶ 78 The court did not give any instruction concerning Price's testimony. But McNeal did not submit an instruction or ask the court to do so when the instructions were discussed. This factor is therefore neutral.

¶ 79 That leaves Price's importance as a witness to the prosecution's case, which was low. Recall that Price had already been identified as the man in the video several times, by multiple people. And critically, Price's invocation of his right to remain silent suggested that he was the one who shot Hopkins. That did not prejudice McNeal. Indeed, McNeal's theory of defense was that

Price was the shooter and that he did not supply the gun or otherwise aid in the murder.

¶ 80    Considering the totality of the circumstances, we conclude that the error does not warrant reversal.

### F.    Exhibits 67-69

¶ 81    Lastly, McNeal argues that the trial court erred when it overruled his hearsay objection to the prosecution's Exhibits 67, 68, and 69.  Exhibit 67 is the time-stamped record of McNeal's GPS data on the day of the Coors Field shooting provided by Attenti, a company that the county uses to provide location data generated by GPS ankle monitors.  Exhibits 68 and 69 are aerial maps with data points plotted from the information in Exhibit 67.  At trial, McNeal argued that these exhibits were hearsay.  The trial court overruled his objection and admitted the exhibits.

¶ 82    For the first time on appeal, McNeal also argues that the trial court violated his Sixth Amendment rights by not allowing him to confront the witness who created the GPS records.

### 1.    Standard of Review

¶ 83    We review McNeal's Sixth Amendment claim for plain error, because, although he preserved his hearsay claim, he did not

preserve the Sixth Amendment claim. *People v. Sparks*, 2018 COA 1, ¶ 29. Under plain error review, we reverse only if there was obvious and substantial error that raises serious doubt about the reliability of the conviction. *Hagos*, ¶ 14. We review McNeal's preserved hearsay objection for an abuse of discretion.

### 2. Analysis

¶ 84 At trial, the prosecution called Shawn Boston, McNeal's pretrial services supervisor, to address Exhibits 67, 68, and 69. Exhibit 67 was a list of GPS location data from McNeal's ankle monitor on the night of the Coors Field shooting. Exhibits 68 and 69 were images of the relevant area, with the GPS coordinates plotted on the map as pinpoints. Boston testified that Exhibit 67 reflected what he and other pretrial employees were able to access when checking a person's location data. The prosecutor created both Exhibits 68 and 69 using Google Maps and the coordinates in Exhibit 67.

¶ 85 Boston testified that he had placed the ankle monitor on McNeal, and that he regularly accessed the records, kept by Attenti, as part of his work. The prosecution elicited the following testimony

from Boston to lay a foundation for admission of the exhibits under

the business records exception to the hearsay rule:

> Q: Okay.  Do you at Pretrial Services, or you personally, maintain all of these records, or do you have to go outside to Attenti to get them?
>
> A: Through my computer at work, I get the records through there, through Attenti.
>
> Q: Is it like a cloud software?  Do you know?
>
> A: I do not know that.
>
> Q: Okay.  Does Pretrial Services create the technology that Attenti uses?
>
> A: No, we do not.
>
> Q: Does Pretrial Services create any GPS technology that is here on Exhibit 67?
>
> A: No, we do not.
>
> Q: Does Pretrial Services maintain these records on behalf of Attenti?
>
> A: We go through Attenti to get all the records, sir.
>
> . . . .
>
> Q: I guess I'm just trying to figure out where — where are these records stored?  You say they're in your computer.  I understand that.
>
> A: Right.

Q: But my question is: Are they your records,
or are they — "you" being Pretrial Services —
or are they Attenti's records?

A: They're Attenti's records, sir.

Q: Thank you very much.

¶ 86    McNeal then objected to admitting the three exhibits on hearsay grounds. Specifically, he argued that Boston could not provide a foundation under CRE 803(6), the business records exception, because he was not the custodian or creator of the records. The court overruled McNeal's objection.

¶ 87    McNeal renews his hearsay objection on appeal, again arguing that Boston was not qualified to lay a foundation for the records. The People argue that the records are not hearsay, and even if they were, Boston laid an adequate foundation.

¶ 88    We acknowledge that the question of when and how a document produced by a computer may be treated as hearsay is fluid. As a division of this court has explained:

> Even if the prosecutor introduced the [r]eports into evidence to prove the truth of their contents, the [r]eports would not be hearsay if a machine generated them automatically. Such records are not hearsay because no "person" or "declarant" made a communicative "statement" within the meaning of CRE 801.

36

. . . .

> A computer-generated record constitutes hearsay, however, when its creation involves human input or interpretation.

*People v. Hamilton*, 2019 COA 101, ¶¶ 24, 26.

¶ 89     We agree with the reasoning in *Hamilton* that a computer report generated without human input does not meet the definition of hearsay because the computer is not a "person" or "declarant" with regards to its computer-generated output.[2]  *Id.*; *see also People v. Abad*, 2021 COA 6, ¶¶ 54-55 (noting that computer extraction reports generated without human intervention are not statements made by a declarant and therefore are not hearsay).

¶ 90     We also recognize that, at a theoretical level, all computer outputs are human generated in the sense that the lines of code and the resulting computer programs and functions are written and developed by humans.  To be clear, we are not saying that simply because information is communicated via a digital platform or is

---

[2] We acknowledge that these issues are evolving with technological advances and may be particularly impacted by the advent of generative artificial intelligence software.

37

otherwise created by a machine automatically means the output falls outside the definition of hearsay.

¶ 91    But where the evidence in question is data that has been generated by a transmitting device sending a signal to a machine and software, without active human intervention, we conclude that there is no declarant, and the record is not hearsay. *See* CRE 801. Therefore, such evidence is admissible — absent a separate evidentiary bar — without the need to establish a hearsay exception.

¶ 92    The GPS data from McNeal's ankle monitor falls into this category. The data was collected automatically by a machine, without human intervention. The data was retrieved only by searching for a specific date range. Therefore, the GPS data from McNeal's ankle monitor was not hearsay and was admissible. *See Commonwealth v. Wallace*, 289 A.3d 894, 904 (Pa. 2023) (concluding that GPS location data is not an assertion made by a person, but rather, data collected electronically by a GPS monitoring device and is therefore not hearsay); *People v. Rodriguez,* 224 Cal Rptr. 3d 295, 314 (Ct. App. 2017) (same); *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109 (9th Cir. 2015) ("A tack

placed by the Google Earth program and automatically labeled with GPS coordinates isn't hearsay.").

¶ 93 Exhibits 68 and 69 are derivative of Exhibit 67 and did not involve substantial human input or modification. The prosecutor represented to the court that he entered the coordinates provided by Exhibit 67 into the Google Maps program, which then generated the coordinates with a "pin" to visually depict where the coordinates were on the map. Although the prosecutor facilitated this process, his actions were akin to entering numbers into a calculator and showing the jury the resulting calculations. Therefore, because Exhibits 68 and 69 were simply derivative of the data in Exhibit 67, they too were not hearsay.

¶ 94 Accordingly, we conclude — albeit on different grounds than the trial court — that Exhibits 67, 68, and 69 were admissible.

¶ 95 For these same reasons, McNeal's unpreserved Sixth Amendment claim fails. *See People v. Smalley*, 2015 COA 140, ¶ 28 ("[T]he Confrontation Clause does not apply to nonhearsay statements.")

## III. Disposition

¶ 96 The judgment of conviction is affirmed.

JUDGE FOX and JUDGE HARRIS concur.